OPINION
{¶ 1} Appellant, William A. Payne, appeals from the June 30, 2004 sentencing entry of the Lake County Court of Common Pleas.
 {¶ 2} On May 12, 2003, appellant was indicted by the grand jury on nine counts: counts one and two, aggravated robbery, first degree felonies, in violation of R.C. 2911.01(A)(1) and2911.01(A)(3), with firearm and repeat violent offender ("RVO") specifications; count three, aggravated burglary, a first degree felony, in violation of R.C. 2911.11(A)(1), with a firearm and RVO specification; count four, kidnapping, a first degree felony, in violation of R.C. 2905.01(A)(2), with a firearm and RVO specification; count five, felonious assault, a second degree felony, in violation of R.C. 2903.11(A)(2), with a firearm and RVO specification; count six, conspiracy to aggravated robbery, a second degree felony, in violation of R.C. 2923.01(A)(1), with a RVO specification; count seven, conspiracy to aggravated burglary, a second degree felony, in violation of R.C.2923.01(A)(1), with a RVO specification; count eight, conspiracy to kidnapping, a second degree felony, in violation of R.C.2923.01(A)(1), with a RVO specification; and count nine, aggravated theft, a third degree felony, in violation of R.C.2913.02(A)(1), with a firearm specification. On May 13, 2003, appellant pleaded not guilty to the charges, and trial was set for May 27, 2003, in Judge Martin Parks' ("Judge Parks") courtroom.
 {¶ 3} On May 23, 2003, appellant waived his constitutional and statutory speedy trial rights, and on June 2, 2003, filed a motion for a continuance. Trial was reset for August 26, 2003. On August 22, 2003, appellant again filed a motion for a continuance, and on August 25, 2003, appellant again waived his constitutional and statutory speedy trial rights. Trial was reset for April 13, 2004. On January 28, 2004, Judge Parks retired. On March 9, 2004, the Supreme Court of Ohio assigned Judge Thomas Curran ("Judge Curran") to handle Judge Parks' docket from February 16, 2004, through April 12, 2004. On April 5, 2004, a hearing was held on John C. Kealy's request to withdraw as appellant's counsel because appellant had threatened him with physical harm. The request was granted and appellant signed a third waiver at that time, agreeing to the new trial date of June 1, 2004, and new counsel was appointed.
 {¶ 4} At the end of Judge Curran's assignment, appellant's case was assigned to Judge Vincent Culotta ("Judge Culotta"), who recused himself on April 30, 2004, since he had been involved in the case as the chief assistant prosecutor. The case was then transferred to Judge Eugene Lucci ("Judge Lucci").
 {¶ 5} On April 26, 2004, appellant filed a motion to suppress, and the hearing was set for June 1, 2004. On May 21, 2004, the trial court reset the suppression hearing to May 25, 2004, and reset the trial date to June 14, 2004. A hearing was held and the court denied appellant's motion to suppress. At that time, the court offered to move the trial court date back to June 1, 2004, but appellant declined.
 {¶ 6} The trial evidence revealed that at about 9:00 a.m. on February 27, 2003, Gail Kopp ("Kopp") was at her condominium in Fairport Harbor, Ohio, getting ready to go to work at her pawnshop in Wickliffe, Ohio. Upon responding to the doorbell, she observed a man outside in a postal uniform ("Postal Man") holding a postal envelope. Upon request, he showed Kopp identification, and when she opened the door slightly to receive the envelope and pen to sign for it, he burst in with another man wearing a ski mask following him. The Postal Man stun-gunned her ten to twelve times from her neck down to her chest. When she did not go down, the men threw her against the wall, slammed her to the ground causing her to hit her head. They then put a snub-nosed gun to her temple, telling her if she did not cooperate they were going to kill her. They punched her so that she would put her hands behind her back, then they tied her wrists tightly with nylon plastic ties. The Postal Man picked her up, dragged her upstairs, put her on her bed, and bound her ankles with plastic ties. They wanted to put duct tape on her mouth, but she said she would die if they did that. She then started wheezing badly, had an asthma attack, and the Postal Man got her inhaler and administered it to her.
 {¶ 7} While the men ransacked Kopp's home, she heard a voice come through what she discerned by the intermittent static to be a walkie-talkie. The voice told "Shon" to get her jewelry and stated that she had a safe and money. The Postal Man held the gun on her and threatened her harm unless she gave them her stuff. The suspects made mention of knowing that she owned a pawnshop. After about forty minutes, they put a blanket on her head, told her if she moved they would kill her, said they would be back to get the rest of her stuff, and left. She managed to retrieve the cordless phone and call 9-1-1.
 {¶ 8} The Fairport Harbor Police Department received Kopp's call at about 9:35 a.m. Several officers arrived at her residence thereafter, including police chief Mark Kish ("Chief Kish") and Lieutenant (then Sergeant) Christopher Cichon ("Lieutenant Cichon"). They found Kopp bound and cut off the ties. She was distraught, crying and had several marks on the left side of her neck, as well as on her wrists and ankles.
 {¶ 9} The assailants took valuables worth almost $1,000,000. Kopp's missing jewelry included an eleven-and-a-half carat pear-shaped diamond ring, which Kopp stated had a retail value of $500,000. The assailants also took old coins, Rolex and Croton watches, money, perfume, a camera, and a Crown Royal bag. In addition, the men took her briefcase, her driver's license and social security number paperwork, the keys to her BMW, her car registration, and her cell phone, which registered approximately forty calls that day after the break-in.
 {¶ 10} Lieutenant Cichon canvassed the area of Kopp's residence and discovered that a vehicle with two black males was seen in the condominium's parking lot the previous week.
 {¶ 11} On February 28, 2003, Agent Dennis Sweet ("Agent Sweet"), from the Bureau of Criminal Investigation's ("BCI") drug task force, received a call from a confidential informant indicating that he had come across jewelry that was taken from a robbery in the Mentor area. Agent Sweet investigated possible crimes in Lake County and discovered the home invasion in Fairport Harbor. He contacted Chief Kish and arranged a meeting.
 {¶ 12} On March 1, 2003, Chief Kish, Agent Sweet, Lieutenant Cichon, and the informant met at the Cleveland drug task force headquarters. The informant stated that a week earlier, a person he had known for about nine months, named "Pookum" (who he later identified by police photos as appellant), told him about a lady who owned a couple of pawnshops with whom he did business. Pookum stated that a robbery was going down and it was going to make him rich. He offered the informant a part in it, and the informant said he would think about it. On February 28, 2003, the informant ran into appellant again, along with Lavelle Byrd ("Byrd"), who he had known for five years, and with an unknown man called Joe (who he later identified by police photos as Joseta Jones-Bey ("Jones-Bey")). While the informant was in his truck, appellant showed him some jewelry by opening a Crown Royal bag and dumping it on the informant's lap. Appellant said that it came from a robbery of the "jewelry lady." The informant knew that appellant brought his half-brother, Guy (later identified as Charles Allen ("Allen")), back from California to do the robbery for him. Police later confirmed that appellant sent Allen $100 and a bus ticket to Cleveland. Appellant asked the informant to move the jewelry out of town for him. The informant said he would make a few calls and get back to him. He put the jewelry back into the bag and handed it to appellant, but later found an emerald and gold ring on the floor of his truck, which he later produced at the meeting (and which Kopp later identified as one of her stolen rings).
 {¶ 13} The informant went with Lieutenant Cichon to point out where he had been shown the jewelry on Rugby Road, and where appellant resided on Humphrey Court. While heading toward the second location, the informant got a call on his cell phone from appellant. The informant told appellant that he had a sale for the platinum stuff, and appellant told him to come get it.
 {¶ 14} A Cuyahoga County prosecutor was contacted to assist in obtaining a search warrant, and on March 2, 2003, Chief Kish, Lieutenant Cichon, and other officers executed the search warrant. Appellant was in an upstairs bedroom. Found in the bedroom were two operational loaded handguns, a stun gun, some jewelry (later determined not to be jewelry from the robbery), marijuana, postal priority mail envelopes, and ski masks. There was also a set of walkie-talkies which was not seized. Appellant was arrested at that time.
 {¶ 15} On March 3, 2003, Agent Sweet saw appellant at the Lake County jail on another matter, and appellant indicated that he was willing to cooperate and supply information. Chief Kish, Lieutenant Cichon, and Chief Assistant Prosecutor Vince Culotta arrived, and appellant identified Anthony Shanklin ("Shanklin"), Allen, and Shon Hickenbottom ("Hickenbottom") as being involved in the event. He said they were going to break into Kopp's pawnshop, but he advised them not to do it there because they would get caught. He told them to follow her and commit the robbery elsewhere. He admitted that he had done business with Kopp previously and had been present a week or two earlier in her shop when the other suspects were there. He loaned them his two snub-nosed revolvers and a stun gun to do the job. Jones-Bey provided the postal uniform. Appellant identified Allen as the man wearing the postal uniform and using the stun gun, and Hickenbottom as the other man who entered the residence wearing a ski mask. Shanklin was the driver of the car. Appellant claimed he was not present at the robbery, but was to receive $400 before the jewelry was pawned for his involvement to that point, and $1,000 after it was sold. The loaned items were returned to him. Jones-Bey and Byrd tried to sell the jewelry, which was in a Crown Royal bag, the night after the robbery.
 {¶ 16} After Kopp positively identified Allen in a photo lineup, he was arrested at a bus terminal heading back to California. Police recovered property from Allen that included a Croton watch, some coins, an earring, and a ring, which were later identified as Kopp's stolen jewelry.
 {¶ 17} Police interviews with Jones-Bey revealed that after September 2002, appellant contacted Jones-Bey about a big lick robbery he was planning, saying he would be rich by summer. After the break-in, appellant came to Jones-Bey's aunt's house on Rugby Road and showed him the jewelry. Jones-Bey failed to provide the police with any facts that would exculpate appellant. However, shortly before trial, appellant filed a notice of alibi, and Jones-Bey testified during the trial that appellant was with him on the morning of the break-in.
 {¶ 18} Immediately after the event, Kopp was black and blue all over her body. Later, she started urinating blood, and her hair and eyelashes fell out from being stun-gunned repeatedly. She continued to have sharp pains in her wrists, and claimed nerve damage. She became a victim of identity theft, and had to have her credit cards changed several times.
 {¶ 19} Kopp had several phone conversations with appellant during the time period from March 7, 2003, until January 2004. When he first identified himself, she recognized that he had been a customer for over two years and remembered he had admired her large diamond ring. He said he could get her jewelry back, but she could not involve the police, and he wanted her to get him out of jail. He said his cousin would bring her jewelry to her the next day. She advised the police, but requested that they stay out of the store during the drop so that she would appear cooperative. On March 8, 2003, appellant's cousin, Larry Payne, arrived with a Crown Royal bag containing some, but not the major pieces, of her stolen jewelry. While he was there, appellant called and said that the guys would not cooperate in bringing the other jewelry back.
 {¶ 20} Appellant continued to call Kopp, telling her that if she would post his bond, he could orchestrate the return of her property. She asked about her ring, and at first he said that he did not have it. He then said that he had it, but did not know that it was hers. The police and Kopp recorded some of these conversations. When appellant became nasty, Chief Kish suggested that she have her number blocked at the jail, but she declined, hoping to gain information. When appellant threatened her life, stating she "would be taken care of," and that he would not be in jail forever and would come get her, she blocked her phone. Months later, she removed the block after appellant wrote to her, claiming he could get her property back. She talked to him, but no other items were returned.
 {¶ 21} About nine months after the incident, Kopp was listening to the taped conversations, and she realized that the voice on the tape was the same as the one on the walkie-talkies.
 {¶ 22} On June 17, 2004, the jury acquitted appellant on counts one through five. The jury found appellant guilty on count six, conspiracy to aggravated robbery, a second degree felony, in violation of R.C. 2923.01(A)(1), with a RVO specification; count seven, conspiracy to aggravated burglary, a second degree felony, in violation of R.C. 2923.01(A)(1), with a RVO specification; count eight, conspiracy to kidnapping, a second degree felony, in violation of R.C. 2923.01(A)(1), with a RVO specification, and count nine, aggravated theft, a third degree felony, with a firearm specification.
 {¶ 23} After the judge dismissed the jury, he held a sentencing hearing on the same day. In a judgment entry dated June 30, 2004, the trial court found appellant to be a repeat violent offender under R.C. 2929.14(D)(2) pursuant to R.C.2941.149(B). The trial court then sentenced appellant to eight years on count six, eight years on count seven, eight years on count eight, five years on count nine, three years on the firearm specification, and ten years on one RVO specification, for an aggregate term of forty-two years. It is from that judgment that appellant filed a timely notice of appeal and makes the following assignments of error:
 {¶ 24} "[1.] The trial court erred to [the] prejudice of [appellant] when the trial court overruled the [m]otion to [d]ismiss of [appellant] under R.C. 2945.71.
 {¶ 25} "[2.] The trial court erred to [the] prejudice of [appellant] when the trial court overruled [appellant's] motion to disclose the identity of the confidential informant.
 {¶ 26} "[3.] The trial court erred to [the] prejudice of [appellant] when the trial court overruled [appellant's] motion under Ohio Rules of Criminal Procedure, Rule 29.
 {¶ 27} "[4.] The trial court erred to [the] prejudice of [appellant] when the trial court sentenced [appellant] to consecutive sentences in violation of R.C. 2945.25.
 {¶ 28} "[5.] The trial court erred to [the] prejudice of [appellant] when the trial court sentenced [appellant] to consecutive sentences enhanced on the strength of findings of fact not determined by the jury beyond a reasonable doubt."
 {¶ 29} In his first assignment of error, appellant argues that he was not brought to trial within the time frame permitted by R.C. 2945.71.
 {¶ 30} The Sixth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution, guarantee an accused the right to a speedy trial by an impartial jury.
 {¶ 31} R.C. 2945.71(C)(2) requires that an individual charged with a felony must be brought to trial within two hundred seventy days after his arrest. The count begins the day after a defendant is arrested. In computing this time, each day a defendant is held in jail, in lieu of bail, counts as three days. R.C. 2945.71(E). This triple-count provision applies only if the defendant is being held in jail solely on the pending charge. State v.MacDonald (1976), 48 Ohio St.2d 66, paragraph one of the syllabus.
 {¶ 32} Defendants may waive their right to a speedy trial.State v. King (1994), 70 Ohio St.3d 158, 160, citing Barker v.Wingo (1972), 407 U.S. 514, 529. However, waivers must be made knowingly, voluntarily, and intelligently. Id.; State v. Adams
(1989), 43 Ohio St.3d 67, 69.
 {¶ 33} In this case, appellant was arrested on March 2, 2003, was held in jail in lieu of bail, and was brought to trial on June 14, 2004. Appellant was served with a holder out of Cuyahoga County, a few days after he was arrested, around March 11, 2003, for a charge not related to the current one. This would normally prevent the triple-count provision from applying, but the state failed to provide either a definite date on which the holder was served, or advise the court if and when the holder was lifted. Absent this information, this court must apply the triple-count provision, subject to any valid tolling items.
 {¶ 34} From March 3, 2003, the day after appellant was arrested, until May 22, 2003, no events occurred which would toll the running of the speedy trial time clock. Thus, eighty-one days of actual time passed, which would count as two hundred forty-three days using the triple-count calculation. On May 23, 2003, four days before appellant's first trial date, he executed an open-ended waiver of his constitutional and statutory speedy trial rights. In this matter, the record indicates that this was a voluntary, knowing, and intelligent waiver. On August 25, 2003, one day before his reset trial date, appellant again signed an open-ended waiver of his constitutional and statutory speedy trial rights. This was also a voluntary, knowing, and intelligent waiver. On April 5, 2004, eight days before his next set trial date, appellant executed a waiver of his constitutional and statutory speedy trial rights until June 1, 2004, which the court made clear was not open-ended. These three waivers tolled the time clock from March 23, 2003, through June 1, 2004.
 {¶ 35} The time count from June 1, 2004 to June 14, 2004, was tolled pursuant to R.C. 2945.72(E). R.C. 2945.72(E) tolls the count for "[a]ny period of delay necessitated by reason of a * * * motion * * * instituted by the accused[.]" On May 28, 2004, appellant filed motions for appointment of counsel and for public payment of transcript. In addition, appellant's motion to dismiss was filed on June 11, 2004. These motions tolled the time clock from the date they were filed until the date they were ruled upon, which was June 14, 2004.
 {¶ 36} Since only two hundred forty-three days were chargeable to the state, this time frame was within the two hundred seventy day limit of R.C. 2945.71. Accordingly, appellant's first assignment of error is without merit.
 {¶ 37} In appellant's second assignment of error, he argues that the trial court should have revealed the identity of the confidential informant, both for purposes of the suppression hearing and for trial, so that appellant could investigate his competence and credibility. He also appears to allege that he was prejudiced at trial when the informant was allowed to testify before appellant could conduct an adequate investigation.
 {¶ 38} A trial court's decision regarding the disclosure of the identity of a confidential informant will not be reversed absent an abuse of discretion. State v. Elersic (Nov. 21, 2001), 11th Dist. Nos. 2000-L-062 and 2000-L-164, 2001 Ohio App. LEXIS 5210, at 18-19. An abuse of discretion is defined as a decision that is unreasonable, arbitrary, or unconscionable, rather than a mere error in judgment. State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 39} Crim.R. 16(B)(1)(e), which appellant relies upon as requiring the disclosure of a confidential informant, provides, in part, that upon a motion of the defendant, the prosecutor must furnish "a written list of the names and addresses of all witnesses whom the prosecuting attorney intends to call attrial * * *. * * * Names and addresses of witnesses shall not be subject to disclosure if the prosecuting attorney certifies to the court that to do so may subject the witness * * * to physical or substantial economic harm or coercion." (Emphasis added.) This rule is not applicable when there is no indication that the prosecution intended to call, as a witness, the informant whose name it has refused to reveal. Elersic, supra, at 18.
 {¶ 40} The Supreme Court of Ohio held that the identity of a confidential informant must be revealed when the testimony of the informant is vital to establishing an element of the crime, or would be helpful or beneficial to the accused in preparing or making a defense to criminal charges. State v. Williams (1983),4 Ohio St.3d 74, syllabus.
 {¶ 41} The defendant bears the burden of establishing the need for learning the identity of an informant. State v.Parsons (1989), 64 Ohio App.3d 63, 69. "Something more than speculation about the possible usefulness of an informant's testimony is required." Id. Disclosure is not required where the informant did not actively participate in the criminal activity, or where the informant's role is that of a mere tipster. SeeState v. Bays (1999), 87 Ohio St.3d 15, 25, and Parsons,
supra, at 67-68.
 {¶ 42} In State v. Taylor (1992), 82 Ohio App.3d 434, the court explained why disclosure is not necessary at a suppression hearing:
 {¶ 43} "In a preliminary suppression hearing, where the issue for determination is not guilt or innocence but probable cause to issue a warrant, the desire to test the credibility and reliability of an informer who has been vouched for by the police is not a consideration that warrants disclosure. McCray v.Illinois (1967), 386 U.S. 300, 304 * * *; State v. Beck
(1963), 175 Ohio St. 73 * * *, reversed on other grounds (1964),379 U.S. 89 * * *. The issue there is the good faith * * * of the police in reasonably relying on the informer's information, and the identity of the informer or [his] testimony is not relevant to that determination." Id. at 446-447. (Parallel citations omitted.)
 {¶ 44} In the current case, the trial court properly conducted the suppression hearing without the presence of the confidential informant or without revealing his identity. Appellant subpoenaed the informant through Agent Sweet for the hearing and was advised that although neither Agent Sweet nor the informant had received the subpoena, the state had asked Agent Sweet to appear. The state had filed a Crim.R. 16(B)(1)(e) certification, stating that the informant was not a necessary witness to the hearing, and that disclosure of his identity would subject him to physical and/or economic harm or coercion and would further hinder his ability to work undercover.
 {¶ 45} Neither the informant's identity nor his testimony was necessary to establish probable cause for obtaining the warrant. Agent Sweet, Chief Kish, and Lieutenant Cichon all testified about the information provided by the informant and the steps they took to verify that information before seeking a search warrant. Moreover, Agent Sweet testified as to the informant's reliability, stating that (1) he had known the informant for six months prior to this incident and had talked to him every couple of days or weekly; (2) during that time, the informant had provided reliable, accurate information about criminal activities; (3) the informant had not provided information that had proved to be false; (4) the information had led to six federal indictments involving large-scale drug dealers; and (5) the informant's information regarding the current case was deemed reliable because he had provided facts that were not yet released, and some information was able to be verified prior to seeking the search warrant. At the hearing, Agent Sweet testified on cross-examination as to the informant's prior convictions, his employment, and his compensation in this case, which was getting a point shaved off a friend's matrix for a federal weapon's charge.
 {¶ 46} Nor did the court err in not ordering the informant's identity be disclosed prior to trial. During most of the case, the state did not intend to call the informant as a witness. From the time the case began until May 28, 2004, the informant was not on the state's possible witness lists. He first appeared as a potential witness under the name of "Confidential Informant of Agent Dennis Sweet," in the state's supplemental discovery filed May 28, 2004. From that time until the trial, appellant did not file any motion to compel disclosure of the informant's identity or argue that disclosure was essential to an element of the charges or beneficial to develop the defense. Moreover, such claims would have been meritless since the informant was not a participant in the criminal activity involved in this case, but merely acted as a tipster.
 {¶ 47} Finally, the trial court properly allowed the informant to testify at trial although appellant did not know his identity beforehand, so that he could conduct a full investigation. A trial court does not abuse its discretion in allowing a witness to testify where the record fails to disclose a willful violation of Crim.R. 16, that foreknowledge of a witness's name would have benefited the accused in the preparation of his defense, or that the accused was unfairly prejudiced. State v. Scudder (1994), 71 Ohio St.3d 263, 269.
 {¶ 48} On June 13, 2004, the day before trial, BCI reversed its objection to disclosing the informant's identity if the state needed the informant as a witness in the event that Byrd and Shanklin did not testify as expected. Appellant conceded in his brief that "the state was surely truthful at the time it represented to the court the confidential informant would not be a witness at trial." Therefore, the state did not willfully violate Crim.R. 16.
 {¶ 49} On June 14, 2004, appellant argued, at his motion to dismiss hearing, that since the informant might appear as a witness and since appellant was denied the right to call this witness at the suppression hearing, appellant should be permitted to reopen the suppression hearing or be given an opportunity to voir dire the informant outside the hearing of the jury. In denying appellant's motion, the trial court found that the informant's reliability, which had already been established at the suppression hearing, was irrelevant to the trial issues, and that BCI's withdrawal of its objection to disclosure was a changed circumstance.
 {¶ 50} At trial, before the informant was called, appellant raised objections to him testifying, arguing that because he had not learned the informant's identity until that time, appellant had not had an opportunity to investigate his background in order to ascertain his credibility. Appellant stated that he also desired to explore, in depth, the deal the informant had been given by providing information. The court found appellant's need to investigate the informant's credibility unpersuasive since the informant's information had been confirmed by appellant's admissions. The court also found that Agent Sweet had testified in depth on direct and cross-examination at the suppression hearing regarding the informant's incentive to come forward.
 {¶ 51} After Byrd and Shanklin were called and refused to testify, the state called the confidential informant, who finally revealed his identity as Shawn Wyan ("Wyan"), and appellant was given an opportunity to cross-examine him. Appellant did not request a motion to continue. The next morning, when the court provided appellant with Wyan's criminal record, which the state had not provided previously because it did not know Wyan's identity, appellant again argued that he did not have time to conduct a proper investigation. The court offered to allow appellant to recall Wyan and to adjourn the trial for five days, in order to give appellant sufficient opportunity to investigate him. The prosecutor did not object to a continuance, but noted that based on conversations with the sheriff's department and Wyan, there were genuine concerns for his safety. Appellant preferred to continue with the trial at that time because he had four witnesses subpoenaed for that day.
 {¶ 52} Before the trial testimony could continue, a sheriff's deputy advised that Byrd and Shanklin, on their way back to jail, had stated that "there's going to be a shoot-out tonight in Cleveland involving the confidential informant." Wyan was relocated to another county for his safety. The court found that "there is genuine concern for the safety of the confidential informant especially when you take into consideration the threats to the prior attorney for [appellant] and everything else that has been discussed * * *." The court asked the state to work with Agent Sweet in conducting investigations based on Wyan's criminal record. The prosecutor offered to stipulate to "information [that] comes forward that's relevant to this case." The court noted that although appellant could recall Wyan, it was not necessary since his testimony was "so readily susceptible to verification. * * * [T]he ring * * * [has] been identified * * * [a]nd a lot of his testimony is verifiable by other people's testimony. * * * Your client made statements * * * that implicated himself. * * * I think he provided very little that could even be subject to a rational [c]ross [e]xamination." The court noted that a continuance could create an opportunity for jury harassment, given that Hickenbottom, a co-conspirator with whom appellant was jailed, had sent a letter to a juror in his case a few weeks earlier.
 {¶ 53} During breaks in trial and during lunch, the state, Judge Lucci, and Agent Sweet scrambled to obtain the information appellant requested regarding Wyan's background. Near the end of the day, appellant's attorney stated that he wanted Wyan to come back to test his credibility, but the court felt that attacks on Wyan's credibility would be fruitless: "You saw him testify. * * * He answered every question, the adverse questions as well as the nonadverse questions. He answered them straight up." Appellant's counsel agreed with the judge, and after a few more discussions, the judge suggested they move forward. Neither the state nor appellant objected.
 {¶ 54} These facts clearly establish that prior disclosure of Wyan's identity as a witness would not have benefited the accused in his defense or made a difference in the outcome of the case. The court, to avoid unfair prejudice, went out of its way to accommodate appellant's concerns, and appellant conceded to proceeding with the trial once the dangerous situation arose. Thus, appellant's second assignment of error is without merit.
 {¶ 55} In appellant's third assignment of error, he alleges that there was insufficient evidence to convict him of counts six through nine, and that the jury verdicts were against the manifest weight of the evidence.
 {¶ 56} A Crim.R. 29(A) motion is properly denied if reasonable minds can reach different conclusions about a defendant's guilt. State v. Apanovitch (1987),33 Ohio St.3d 19, 23.
 {¶ 57} As this court stated in State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L0-82, 1994 Ohio App. LEXIS 5862, at 13-14:
 {¶ 58} "`Sufficiency' challenges whether the prosecution has presented evidence on each element of the offense to allow the matter to go to the jury, while `manifest weight' contests the believability of the evidence presented.
 {¶ 59} "`"(* * *) The test (for sufficiency of the evidence) is whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt. The claimof insufficient evidence invokes an inquiry about due process. Itraises a question of law, the resolution of which does not allowthe court to weigh the evidence. * * *"'" (Emphasis sic.) (Citations omitted.)
 {¶ 60} In Schlee, supra, at 14-15, we also stated that:
 {¶ 61} "`[M]anifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense.
 {¶ 62} "`In determining whether the verdict was against the manifest weight of the evidence, "(* * *) the court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (* * *)" (Citations omitted.) * * *'" (Emphasis sic.)
 {¶ 63} A judgment of a trial court should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 64} Under the sufficiency argument, appellant does not state what elements of the offenses the state failed to prove beyond a reasonable doubt. The trial evidence clearly established that Allen, Shanklin, and Hickenbottom committed the offenses of aggravated robbery, aggravated burglary, and kidnapping. Appellant did not present any contradictory evidence, but tried to establish that he was not present at the time, and that while he may have been in receipt of stolen property, he did not plan or assist in these offenses.
 {¶ 65} R.C. 2923.01(A)(1) governs the crime of conspiracy and states that "[n]o person, with purpose to commit or to promote or facilitate the commission of * * * kidnapping, * * * aggravated robbery, * * * aggravated burglary, * * * shall * * * [w]ith another person or persons, plan or aid in planning the commission of any of the specified offenses."
 {¶ 66} The jury heard testimony that appellant (1) had been in Kopp's pawnshop on several occasions and had admired her diamond ring; (2) had been in Kopp's pawnshop a week or two before the robbery with the suspects; (3) told Jones-Bey that he was planning a big lick robbery and would be rich by summer; (4) paid for his step-brother to come back from California to do the robbery for him; (5) solicited Wyan to be part of the robbery; (6) told others not to rob Kopp at her store, but to rob her elsewhere; (7) provided the tools of the crimes, including the loaded hand guns, the stun-gun, and the ski mask; (8) had walkie-talkies in his bedroom after the crime; (9) was to receive $400 before the jewelry was sold for his involvement to that point, and $1,000 after it was sold; (10) showed Wyan the jewelry the day after the robbery and asked him to move it out of town for him; and (11) had control of some of the jewelry even after he was in jail.
 {¶ 67} To prove aggravated theft, the state had to meet the elements of R.C. 2913.02(A)(1) which provides that "[n]o person, with purpose to deprive the owner of property * * * shall knowingly obtain or exert control over * * * the property * * * in any of the following ways: * * * [w]ithout the consent of the owner or person authorized to give consent[.]" The state also had to meet the elements of R.C. 2913.02(B)(2), which provides that "[i]f the value of the property * * * stolen is one hundred thousand dollars or more and is less than five hundred thousand dollars, a violation of this section is aggravated theft * * *."
 {¶ 68} The testimony listed above demonstrated that appellant had a purpose to deprive Kopp of her property, and that it came into his hands, giving him control over it. Kopp testified that she did not consent to the theft of her property, and further testified that the value of the stolen property was close to $1,000,000. In addition, Chief Kish obtained an opinion of a jeweler that the pear-shaped diamond ring was worth at least $300,000.
 {¶ 69} Therefore, according to Schlee, supra, any rational trier of fact could have found present all of the elements of the three offenses of conspiracy and the offense of aggravated theft beyond a reasonable doubt.
 {¶ 70} Furthermore, in reviewing the entire record, we find that the state provided substantial, credible evidence to support the jury findings. Although Jones-Bey presented alibi testimony that the morning of the break-in, he picked appellant up in Cleveland and they smoked a couple of joints, the jury was free to disregard this testimony. According to the times given, appellant may have had time to return to Cleveland, and further, Jones-Bey was not able to provide a reasonable explanation as to why he waited so long to come forth with this information about his friend. Therefore, the jury did not lose its way in convicting appellant. Appellant's third assignment of error is without merit.
 {¶ 71} Appellant argues in his fourth assignment of error that R.C. 2941.25 prohibits the trial court from sentencing appellant separately and consecutively on each of the three conspiracy charges and on the aggravated theft charge because they were allied offenses of similar import. The record shows that appellant did not raise this allied offense argument at any time prior to appeal.
 {¶ 72} "`It is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.'" State v.Campbell (1994), 69 Ohio St.3d 38, 40-41, quoting State v.Childs (1968), 14 Ohio St.2d 56 * * *, paragraph three of the syllabus. (Parallel citation omitted.) However, "[u]nder Crim.R. 52(B), we have power to recognize `plain errors or defects involving substantial rights (* * *) although they were not brought to the attention of the [trial] court.'" Id. at 41. Appellate courts should only invoke this rule, however, in rare cases. This is because "an alleged error `does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise.'" Id., quoting State v. Long (1978),53 Ohio St.2d 91 * * *, paragraph two of the syllabus. (Parallel citation omitted.)
 {¶ 73} Furthermore, we note that appellant did not argue plain error in his appellate brief. However, in the interest of justice, this court invokes the plain error doctrine sua sponte since the issue involves a matter of appellant's substantial, due process rights.
 {¶ 74} Appellant contends that, pursuant to R.C. 2941.25, the trial court should not have sentenced him consecutively on each of the three conspiracy charges and on the aggravated theft charge because he maintains that he committed them with the same animus.
 {¶ 75} R.C. 2941.25 provides that:
 {¶ 76} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 77} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 78} "In order to determine whether multiple crimes should be merged, the Ohio Supreme Court has developed a two-step test: first, the court must determine whether the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other. If so, the crimes are allied offenses of similar import. However, the inquiry does not stop there. If the offenses are allied and of similar import for purposes of the first step, the court mustthen address the second prong; namely, the court must review the defendant's conduct to determine whether he can be convicted of both offenses. If the court finds that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both." State v. While,
11th Dist. No. 2001-T-0051, 2003-Ohio-4594, at ¶ 17, citingState v. Nicholas (1993), 66 Ohio St.3d 431, 434, citing Statev. Blankenship (1988), 38 Ohio St.3d 116, 117. (Emphasis added.) Thus, if the answer to the first prong is that the offenses are not of similar import, then the court does not have to reach the second prong.
 {¶ 79} Appellant was convicted of aggravated theft pursuant to R.C. 2913.02(A)(1) which provides that, "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent[.]" R.C. 2923.01(A)(1) governs the crime of conspiracy. It provides that, "[n]o person, with purpose to commit or to promote or facilitate the commission of * * * kidnapping, * * * aggravated robbery, * * * or aggravated burglary, * * * shall * * * [w]ith another person or persons, plan or aid in planning the commission of any of the specified offenses[.]" This court concludes that pursuant to the first step, the crimes involved here are not so similar that commission of one will result in the commission of the other. Thus, they are not allied offenses of similar import. As such, the sentence for aggravated theft should not be merged with the conspiracy offenses.
 {¶ 80} We will now address what we deem to be the applicable legal sentencing principles of law which apply to the case sub judice, consistent with our multiple analyses under the plain view doctrine. In State v. Childs (2000), 88 Ohio St.3d 558,561, the Supreme Court of Ohio stated that when the underlying issue is multiplicity, we must be mindful of the constitutional concerns of the Double Jeopardy Clause of the Fifth Amendment.
 {¶ 81} In Childs, the Supreme Court of Ohio held that when an offender has multiple conspiracy convictions, a court must look at R.C. 2923.01(F) which "sets forth an additional limitation upon multiple punishments in the context of conspiracy offenses." Id. at 561. Essentially, R.C. 2923.01(F) prohibits multiple convictions for a single conspiracy. Id. at 562.
 {¶ 82} R.C. 2923.01(F) provides that, "[a] person who conspires to commit more than one offense is guilty of only one conspiracy, when the offenses are the object of the same agreement or continuous conspiratorial relationship." Therefore, we must determine "(1) whether the offenses are the object of the same agreement, and (2) whether the offenses are part of a continuous conspiratorial relationship." Childs, supra, at 562. The Supreme Court of Ohio made it very clear that, "[i]f either
circumstance exists, the offenses constitute one conspiracy and may not be separately punished." Id. (Emphasis added.)
 {¶ 83} In Childs, the Supreme Court gave lower courts guidance on the two-prong analysis. Under the "single agreement" portion, lower courts must analyze "whether the evidence supports the existence of one or multiple agreements." Id. "[W]here the evidence reveals one agreement, that `agreement cannot be taken to be several agreements and hence several conspiracies * * *.'" Id., quoting Braverman v. United States (1942), 317 U.S. 49,53.
 {¶ 84} The evidence in this case supports the fact that the conspiracies resulted from a single agreement. The evidence reveals that the offenders conspired to rob the victim at her home with a snub-nosed gun and a stun gun in order to steal her jewelry and later sell it for profit. There was a single, elaborate, and well-thought out agreement. Furthermore, there was no evidence that separate agreements existed with respect to the target crimes of burglary, kidnapping and robbery.
 {¶ 85} Even if we were to consider, as appellee suggested, "the distinct possibility that new agreements and objectives were made by [a]ppellant and his co-conspirators throughout the incident while talking on walkie-talkies[,]" the argument would still fail. Appellee points out that the victim "specifically testified that she overheard [a]ppellant and her attackers communicate and direct each other over these devices throughout the robbery." However, even if this "distinct possibility" occurred and we concluded that multiple agreements existed, we must also determine, under the second prong of R.C. 2923.01(F), whether these agreements were part of an overall, continuing, conspiratorial relationship. And under the second prong, appellee's argument would certainly fail because even if there were subsequent multiple agreements, there was definitely a "`common plan or scheme to achieve a common, single, comprehensive goal.'" Childs, supra, at 563, quotingCommonwealth v. Davis (Pa.Super. 1997), 704 A.2d 650, 654
(Supreme Court's guidance on analyzing the second prong).
 {¶ 86} The evidence clearly reveals that there was a "common plan or scheme to achieve a common, single, comprehensive goal." That goal was, as appellee aptly stated, "to rob [the victim] of her jewelry at her home and later sell it for profit." Thus, the conspiracy to commit aggravated burglary, conspiracy to commit aggravated robbery, and conspiracy to commit kidnapping were all part of achieving that one overall objective. As such, appellant cannot be punished for multiple conspiracy offenses when the offenses were the result of a single conspiracy.
 {¶ 87} Thus, although appellant failed to raise this issue with the trial court or with this court, in the interest of justice pursuant to our authority under the plain error doctrine, we conclude that the trial court erred in sentencing appellant separately on each count of conspiracy. The conspiracy sentences, eight years for each count, should be merged, leaving appellant with one eight-year prison term for the three conspiracies. Hence, appellant's fourth assignment of error has merit.
 {¶ 88} In appellant's final assignment of error, he argues that per Apprendi v. New Jersey (2000), 530 U.S. 466, Blakelyv. Washington (2004), 542 U.S. 296, and United States v.Booker (2005), 125 S.Ct. 738, the trial court erred when it sentenced appellant to consecutive sentences, and an enhanced penalty for the RVO specification, based on findings of fact that were not determined by the jury.
 {¶ 89} We reject appellant's argument that a court's findings of fact in imposing consecutive sentences must be determined by a jury. In Apprendi, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. The Blakely court thereafter clarified that "the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basisof the facts reflected in the jury verdict or admitted by thedefendant." Blakely, supra, at 303. (Emphasis sic.) The court reaffirmed these principles in Booker, and further clarified that "when a trial judge exercises his discretion to select a specified sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." Booker, supra, at 750. (Emphasis added.)
 {¶ 90} Appellant was sentenced to the maximum prison term of eight years on each of the second degree felonies, and to the maximum prison term of five years on the third degree felony, each within the prescribed statutory maximum as permitted byApprendi, Blakely, and Booker. This court has consistently ruled that the imposition of consecutive sentences for multiple offenses does not violate these cases, as long as the sentence does not exceed the statutory maximum for each individual underlying offense. See, e.g., State v. Perry, 11th Dist. No. 2004-T-0113, 2005-Ohio-4653, at ¶ 39; State v. Fatica, 11th Dist. No. 2004-L-078, 2005-Ohio-4209, at ¶ 37; State v. Semala,
11th Dist. No. 2003-L-128, 2005-Ohio-2653, at ¶ 36; State v.Morales, 11th Dist. No. 2003-L-025, 2004-Ohio-7239, at ¶ 87;State v. Rupert, 11th Dist. No. 2003-L-154, 2005-Ohio-1098, at ¶ 47; State v. Taylor, 158 Ohio App.3d 597, 2004-Ohio-5939, at 604.
 {¶ 91} However, we agree with appellant's argument that the trial court erred in its imposition of a ten-year sentence on the RVO specification.
 {¶ 92} This writer is mindful of this court's opinion inState v. Adams, 11th Dist. No. 2003-L-110, 2005-Ohio-1107, of which this writer was a member of that panel. In Adams, the appellant was indicted for, inter alia, "two counts of aggravated vehicular homicide, * * * each count carrying a repeat violent offender specification under R.C. 2941.149 * * *." Id. at ¶ 1. The jury found Adams guilty on the two counts, with repeatviolent offender specifications. Id. at ¶ 8. Subsequent to the trial, the trial court found Adams to be a repeat violent offender and sentenced him to the maximum term for each felony, as well as an enhanced penalty of two consecutive five-year prison terms for each RVO specification. Id. at ¶ 9. We affirmed the trial court's decision and held that "Ohio's procedure for imposing an additional sentence for the repeat violent offender specification is constitutionally valid under Apprendi andBlakely." Id. at ¶ 78.
 {¶ 93} However, since Adams, our court, as well as many reviewing courts in Ohio, has had an extended period to reexamine some of our prior positions in light of more recent nuances pertaining to the Blakely chain of cases and their holdings. Additionally, the opportunity to address new issues that have arisen as a result of Blakely has obtained, as well as being able to readdress prior holdings on evolving questions in a more insightful manner. This is true of this panel's view that our prior position expressed in the Adams case, that Ohio's RVO statute does not violate Blakely, should be reexamined.
 {¶ 94} It is this panel's view that this court should readjust its previous position regarding this issue. We have undertaken a focused scrutiny of the underlying facts and operative statutory framework in Blakely and our case sub judice. We conclude that the parallels are functionally identical. Thus, it is our present position that we should depart from our holding in Adams.
 {¶ 95} Ohio's sentencing requirements relating to RVOs are set out in R.C. 2929.14(C) and (D)(2). R.C. 2929.14(C) provides that the longest prison term may be imposed upon certain offenders, including "certain repeat violent offenders in accordance with division (D)(2) of this section." R.C.2929.14(D)(2)(a), as applicable to this case, provides that where an offender is convicted or pleads to a felony and also is convicted or pleads to a RVO specification, the trial courtshall impose a prison term from the range authorized for the felony, which may be the longest term. Thus, the court has discretion regarding the term it will impose in that range for the underlying felony. If a repeat offender's prior conviction involved violence, the offender may be subject to additional penalties.
 {¶ 96} R.C. 2941.149(C) provides that "repeat violent offender" has the meaning set forth in R.C. 2929.01(DD), which defines a RVO as: "a person about whom both of the following apply:
 {¶ 97} "(1) The person has been convicted of * * * and is being sentenced for committing * * * a felony of the first degree * * *, or a felony of the second degree that involved an attempt to cause serious physical harm to a person or that resulted in serious physical harm to a person.
 {¶ 98} "* * * (a) The person previously was convicted of or pleaded guilty to, and previously served * * * a prison term for * * *
 {¶ 99} "(i) * * * a felony of the first or second degree that resulted in the death of a person or in physical harm to a person * * *."
 {¶ 100} R.C. 2929.149(A) provides that this determination, "that the offender is a repeat violent offender[,]" must be specified in the indictment. However, it is "[t]he court [who] determine[s] the issue of whether an offender is a repeat violent offender." R.C. 2929.149(B).
 {¶ 101} If the court determines that an offender is a RVO, the court may impose an additional prison term of up to ten years if the court has already imposed the maximum authorized sentence on the offender for the underlying felony. R.C. 2929.14(D)(2)(b). However, to do so, a trial court must find that both of the following apply:
 {¶ 102} "(i) The terms so imposed are inadequate to punish the offender and protect the public from future crime, because the applicable factors under [R.C.] 2929.12 indicating a greater likelihood of recidivism outweigh the applicable factors * * * indicating a lesser likelihood of recidivism. ["recidivism factors"].
 {¶ 103} "(ii) The terms so imposed are demeaning to the seriousness of the offense, because * * * the factors under [R.C.] 2929.12 indicating that the offender's conduct is more serious than conduct normally constituting the offense are present, and they outweigh the applicable factors * * * indicating that that offender's conduct is less serious than conduct normally constituting the offense." ["seriousness factors"].
 {¶ 104} We will address the two issues separately: one, the court's determination that appellant was a RVO and two, the court's imposition of an additional ten-year sentence based on the RVO determination and the pertinent applicable statutory factors.
 {¶ 105} In determining whether appellant was a RVO, the judge heard evidence as to appellant's prior convictions (permitted under Apprendi). However, in determining whether a repeat offender is a "repeat violent offender," the court must also determine if the prior conviction "resulted in the death of a person or in physical harm to a person[.]" R.C.2929.01(DD)(2)(a)(i). If the underlying felony was murder, this additional fact is apparent. However, if the additional fact is not apparent from the felony conviction, then the judge must hear additional evidence as to this fact and make an independent, judicial finding that it occurred.
 {¶ 106} Likewise, the judge must make an independent determination as to whether the current conviction "involved an attempt to cause serious physical harm to a person or * * * resulted in serious physical harm to a person." R.C. 292901(DD)(1). (Emphasis added).
 {¶ 107} Here, the underlying prior convictions were conspiracy to aggravated robbery, conspiracy to aggravated burglary, and conspiracy to kidnapping. Thus, it was not apparent on the face of these prior convictions that death or physical harm resulted to a person. As such, the judge heard testimony to these facts and concluded that "the previous conviction * * * resulted in physical harm to a person[.]"
 {¶ 108} In addition, the judge heard testimony as to whether serious harm resulted in the current case, as it was not apparent from the underlying felonies. After hearing testimony, the judge found "that serious physical harm was induced to the [victim]" and made the determination that the appellant "is a repeat violent offender as defined by [R.C.] 2929.01[DD]."
 {¶ 109} After determining appellant was a repeat violent offender, the judge continued to the sentencing phase of the hearing. Pursuant to R.C. 2929.14(D)(2)(b), the judge heard testimony and made findings as to the "seriousness factors" and "recidivism factors."
 {¶ 110} The court's findings relative to the "seriousness factors" included "[t]he fact that the victim suffered serious physical, psychological and economic harm[,] * * * that the scars, psychological scars of this home invasion will last a lifetime for the victim[,] * * * [that] these men barged into her home[,] [t]hey brutally, brutally stun gunned her into submission, brutally tied her up, and then robbed her of well over $100,000." After also considering mitigating factors (co-defendants gave the victim an inhaler), the judge concluded that "the harm is much greater than what a normal aggravated theft, aggravated robbery, aggravated burglary, or kidnapping would be." In addition, the judge found that the "organized criminal activity makes this a more serious offense."
 {¶ 111} The judge went on to consider the "recidivism factors." He found that "there is a long previous criminal history with this [appellant]." He noted that the prosecutor outlined appellant's criminal history. He found that "there's been a extreme rehabilitation failure after these previous convictions, and a failure to respond in the past to probation or parole." (Sic). He found "no genuine remorse" and "that the offense was committed under circumstances extremely likely to recur."
 {¶ 112} The judge, following the statutory framework set forth by the Ohio General Assembly, concluded that "the shortest prison term will demean the seriousness of [appellant's] conduct, and the shortest prison term will not adequately protect the public from future crime by this [appellant] * * *." The judge further found this crime to be "the worst form of the offense, and that [appellant] poses the greatest likelihood of committing future crimes." In doing so, he then sentenced appellant to the maximum sentence of ten years for the RVO specification.
 {¶ 113} However, we now hold that the statutory framework in Ohio for determining whether an offender is a RVO and for enhancing penalties on that determination violates the rule inApprendi, Blakely, and Booker. These cases set forth the principle that defendants have a constitutional right to have a jury make factual findings in a criminal case, other than prior convictions, that will enhance a penalty beyond the prescribedstatutory maximum.
 {¶ 114} Specifically, under Ohio's RVO statute, in order for a judge to make a determination that an offender is a repeat violent offender, the judge must make independent, judicial findings that "serious harm" occurred in the current conviction and that "physical harm" occurred in the prior conviction. Thus, the judge must make findings based on facts that go beyond what is permissible (i.e., prior convictions) under Apprendi andBlakely. Here, the judge considered appellant's prior convictions. If that is all that the judge would have considered, the prior convictions, then it would have been permissible. However, he then made additional findings, that there was "physical harm" in the prior conviction and "serious harm" in the current conviction, to determine that appellant was a RVO. These findings go beyond what is constitutionally permissible underApprendi and Blakely; i.e., any fact, other than a priorconviction, must be determined by a jury or admitted by the appellant.
 {¶ 115} As the Eighth District Court of Appeals recently stated, "[t]he Ohio repeat violent offender law is remarkably similar to the Washington statute [in Blakely]." State v.Malcolm, 8th Dist. No. 85351, 2005-Ohio-4133, at ¶ 5. "The Washington law allows for upward departure based on a judicial finding of `deliberate cruelty.' The Ohio law allows for upward departure based on a finding by the judge of `physical harm * * * or [serious harm].'" Id.
 {¶ 116} Likewise, when sentencing, Ohio's RVO statute permits a judge to impose a sentence that is higher than the statutory maximum for the felony range, if the judge makes independent,judicial findings as to how serious the appellant's crime was ("seriousness factors") or how the sentence will protect the public ("recidivism factors"). The rule set forth in Blakely,
however, is that the maximum sentence a judge can impose is themaximum sentence a judge may impose without any additionalfindings. Blakely, supra, at 303-04. In Blakely, it was the Washington judge's additional, independent finding that the offender had acted with "deliberate cruelty" that had enhanced the offender's sentence by an additional ninety months, beyond the statutory maximum of forty-nine to fifty-three months for the underlying felony. Id. at 304. Here, it was the trial judge'sindependent findings as to the seriousness of the offense andthe likeliness of reoccurrence that enhanced appellant's sentence by ten years under the RVO specification. Theseadditional findings, necessary to enhance appellant's sentence under the RVO specification, should have been decided by a jury (if appellant did not admit them, which he did not) pursuant to his Sixth Amendment right and as set forth inBlakely.[1]
 {¶ 117} As stated by the United States Supreme Court inBlakely, a judge may not impose a sentence above the statutory maximum for a particular offense. Id. The "statutory maximum" forApprendi purposes is not "the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Id. at 303-304. (Emphasis sic).
 {¶ 118} In Booker, the Supreme Court of the United States reaffirmed the holding in Apprendi and Blakely stating: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Booker, supra, at 756.
 {¶ 119} Therefore, we find that Blakely proscribes the repeat violent offender sentencing enhancement, authorized by R.C. 2941.149 and R.C. 2929.14(D)(2)(a), and renders this portion of the Ohio sentencing statute unconstitutional. Thus, appellant's fifth assignment of error is sustained, and the additional ten-year enhanced sentence imposed is vacated.
 {¶ 120} For the foregoing reasons, appellant's first, second, and third assignments of error are not well-taken. Appellant's fourth assignment of error has merit to the extent that all three conspiracy charges relating to aggravated robbery, aggravated burglary, and kidnapping, should be merged into one sentence not exceeding eight years. Appellant's fifth assignment of error is overruled in part, as to the consecutive sentences, and sustained in part, as to the repeat violent offender specification enhancement. The trial court is instructed on remand, in its resentencing exercise, to merge the three conspiracy sentences into one component sentence not to exceed eight years; that it may reinstate its sentence of five years for aggravated theft and three years for the firearm specification; and that its aggregate sentence should not exceed sixteen years. The judgment of the Lake County Court of Common Pleas is affirmed in part, reversed in part, and remanded to modify its judgment entry consistent with this opinion.
Rice, J., O'Toole, J., concur.
[1] The present Ohio statutory framework does not indicate that the jury may undertake a factual finding of an RVO specification in an indictment of the pertinent factors necessary to make a determination regarding an RVO specification. See R.C. 2941.149
and State ex rel. Mason v. Griffin (2004), 104 Ohio St.3d 279. See, also, Lewis R. Katz, Paul C. Giannelli, Beverly J. Blair and Judith P. Lipton, Baldwin's Oh. Prac. Crim. L., § 115:2.50, Right to Jury in Sentencing, (Thompson/West 2005), for a general discussion on reconciling Ohio's sentencing structure with the holdings in Blakely and Apprendi.