OPINION
{¶ 1} Defendant-appellant, Carole Jean Kidd, appeals her convictions for various counts of Trafficking in Cocaine, Possession of Cocaine, Illegal Manufacture of Drugs, and Possessing Criminal Tools, and her aggregate prison sentence of twelve years following a jury trial in the Lake County Court of Common Pleas. For the following reasons, we affirm Kidd's convictions and the sentence imposed by the court below.
 {¶ 2} In July 2005, the Fairport Harbor Police Department received an anonymous phone call regarding suspicious activity occurring at an apartment located *Page 2 
at 224 Seventh Street. The caller complained of an unusually high number of short-term, non-resident visitors to the building and suspected drug dealing. The police conducted sporadic surveillance of the apartment and, through vehicle registration records, determined Kidd to be the occupant of the unit.
 {¶ 3} On October 23 and 24, 2005, a female ("confidential informant"), claiming to be Kidd's friend, came to the Fairport Harbor Police Department and reported drug activity taking place at Kidd's apartment. The informant reported that she had been smoking crack at Kidd's apartment and had observed Kidd go outside to sell some crack, although she did not actually observe the sale or the crack sold. The informant also told police that a Darrin Sweeney was staying with Kidd and manufacturing the crack which Kidd sold. The informant told police that Sweeney was driving a vehicle owned by Phillip Nelson. The informant identified several persons present at Kidd's apartment, including a James Evans and/or his children and a Roger Salupo.
 {¶ 4} Fairport Harbor police were aware of drug-related incidents involving Nelson, Evans, and Salupo. Further surveillance of Kidd's apartment confirmed the presence of a Dodge Durango registered to Nelson and a vehicle registered to Evans.
 {¶ 5} On October 26, 2005, Fairport Harbor police conducted a "trash pull" from 224 Seventh Street, i.e. trash regularly collected from the building was delivered to police. Lieutenant Christopher J. Cichon isolated three bags coming from Kidd's apartment. These bags contained empty boxes of Chore Boy copper scrubbers; burnt pieces of Chore Boy in cylindrical shapes; plastic baggies with the corners torn off; the corners of plastic bags, some of which had been tied and ripped open; a corner piece of a plastic bag containing two white rocks which tested positive as having a cocaine base. *Page 3 
 {¶ 6} Based on this information, Fairport Harbor Police Chief Mark H. Kish submitted an affidavit to the Lake County Court of Common Pleas, requesting a warrant to search Kidd's apartment for evidence of drug manufacturing and/or abuse. In the affidavit, Kish explained that Chore Boys are used as filters in crack pipes and that using the corners of plastic bags is a common method of packaging crack cocaine for sale. Kish's affidavit also stated that the informant "saw drug manufacturing and drug use at the apartment."
 {¶ 7} On October 27, 2005, the common pleas court issued the requested warrant. Fairport Harbor police, supported by members of the Lake County Narcotics Agency, executed the search at about 5:00 p.m. the same day. The police apprehended four suspects, Kidd, Sweeney, Evans, and Brooke Blewitt. Sweeney was found to have $1,470 in cash in his front pocket. On a shelf in the kitchen, police found two glass beakers, two glass measuring cups, and a plastic measuring cup. All these had a white residue which tested positive for cocaine. Also in the kitchen, police found a box of sandwich bags and a box of syringes. At trial, Sergeant Brad Kemp of the Lake County Narcotics Agency explained how the beakers and measuring cups would be used to transform powder cocaine into crack cocaine; how the crack cocaine is typically "bagged" for sale; and how powder cocaine may be ingested intravenously.
 {¶ 8} In the living room, police found crack cocaine, a bag of marijuana, smoking pipes, and burnt Chore Boys.
 {¶ 9} In the bedroom, police found a pill bottle with rocks of crack cocaine in a dresser. Underneath the dresser, police found a digital scale which had cocaine *Page 4 
residue on it. In the bedroom was a book entitled "Cocaine Handbook" which explains how to purify cocaine, i.e. produce crack. Police found men's clothing in the bedroom.
 {¶ 10} Also in the bedroom was a combination safe. The police obtained an override key for the safe from the key ring holding the keys for the Durango which Sweeney was using. Inside the safe was a loaded .38 caliber revolver, its case, a box of .38 caliber ammunition, and a plastic grocery bag. The plastic grocery bag contained numerous plastic baggies variously filled with 294.34 grams of powder cocaine and 118.33 grams of crack cocaine. Sergeant Kemp estimated the street value of the cocaine at over $40,000. Sweeney's fingerprints were found on the scale and the Cocaine Handbook.
 {¶ 11} The police were able to trace the handgun back to a Dan Wysocki, from whom it had been stolen by David Shermer. Shermer initially told police that he had sold the gun to Sweeney. At trial, Shermer testified that he had given the gun to Kidd in exchange for crack. Shermer also testified that he knew Sweeney through Kidd and that he had previously purchased crack from both Sweeney and Kidd.
 {¶ 12} At the time of her arrest, Kidd admitted that one of the crack pipes and the crack found in the living room were hers. About two weeks after her arrest, Kidd met with Chief Kish with her attorney present. Kidd told Kish she was aware that there were drugs in the safe, but that she was unaware of the quantity. Kidd also told Kish that the safe belonged to a Jeffrey Spikes.
 {¶ 13} On March 17, 2006, Kidd was indicted by the Lake County Grand Jury as follows: Trafficking in Cocaine (count one), a felony of the first degree in violation of R.C. 2925.03(A)(2), with a Major Drug Offender specification pursuant to R.C. *Page 5 2941.1410; Possession of Cocaine (count two), a felony of the first degree in violation of R.C. 2925.11, with a Major Drug Offender specification pursuant to R.C. 2941.1410; Trafficking in Cocaine (count three), a felony of the second degree in violation of R.C.2925.03(A)(2); Possession of Cocaine (count four), a felony of the second degree in violation of R.C. 2925.11; Illegal Manufacturing of Drugs (count five), a felony of the second degree in violation of R.C.2925.04; Possessing Criminal Tools (count six), a felony of the fifth degree in violation of R.C. 2923.24; and Permitting Drug Abuse, a felony of the fifth degree in violation of R.C. 2925.13(B).
 {¶ 14} On April 10, 2006, Kidd filed A Motion to Produce Informant, requesting an order compelling the prosecution to divulge the identity of its confidential informants.
 {¶ 15} On May 11, 2006, Kidd filed a Motion to Suppress, requesting the suppression of all evidence seized from her apartment on October 27, 2005, as the result of an illegal search.
 {¶ 16} On May 18, 2006, the trial court denied Kidd's Motion to Produce Informant. On May 26, 2006, Kidd filed a Motion to Reconsider and Motion to Reveal All Confidential Source(s) and Supporting Data.
 {¶ 17} On June 6, 2006, a suppression hearing was held. On June 9, 2006, the trial court denied Kidd's Motion to Suppress and Motion to Reconsider.
 {¶ 18} On July 6, 2006, a jury trial commenced. On July 7, 2006, the jury returned its verdict finding Kidd guilty on all charges.
 {¶ 19} On August 9, 2006, a sentencing hearing was held. On August 15, 2006, the trial court entered its judgment entry of sentence. For first degree Trafficking in Cocaine (count one), the court imposed a ten year prison sentence. For second degree *Page 6 
Trafficking in Cocaine (count three), the court imposed an eight year prison sentence. The trial court merged the Possession convictions (counts two and four) into the Trafficking convictions. For Illegal Manufacturing of Drugs (count five), the court imposed a five year prison sentence. For Possessing Criminal Tools (count six) and Permitting Drug Abuse (count seven), the court imposed twelve month prison sentences. The court ordered all sentences to be served concurrently. The court imposed an additional, consecutive two year prison sentence for the Major Drug Offender specification for an aggregate prison term of twelve years. Finally, the court imposed a mandatory $10,000 fine pursuant to R.C. 2929.18(B)(1); suspended Kidd's driver's license for six months; imposed five years of post release control; and ordered Kidd to pay prosecution costs and supervision fees.
 {¶ 20} Kidd timely appeals and raises the following assignments of error:[1]
 {¶ 21} "[1.] The trial court erred in overruling the defendant-appellant's motion to produce the confidential informant in violation of the defendant-appellant's rights to fair trial, due process and to confront witnesses and present witnesses on her behalf under Article I, Section 10 of the Ohio Constitution and the Fifth, Sixth, andFourteenth Amendments of the United States Constitution.
 {¶ 22} "[2.] The trial court erred when it denied defendant-appellant's motion to suppress the search of her apartment in violation of her rights to due process and to be free from unreasonable search and seizure pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and Sections 10 and 14 of the Ohio Constitution. *Page 7 
 {¶ 23} "[3.] The trial court committed reversible error when it gave a complicity instruction over the objections of the defendant-appellant in violation of the defendant-appellant's rights to due process and fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16, Article I of the Ohio Constitution.
 {¶ 24} "[4.] The trial court erred to the prejudice of the defendant-appellant when it denied her motion for acquittal made pursuant to Crim.R. 29(A).
 {¶ 25} "[5.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.
 {¶ 26} "[6.] The trial court erred to the prejudice of the defendant-appellant when it ordered that she pay a $10,000 mandatory drug fine.
 {¶ 27} "[7.] The trial court erred by imposing an additional two-year prison term under the Major Drug Offender specifications in violation of the defendant-appellant's due process rights under the Fifth andFourteenth Amendments to the U.S. Constitution and Section 10, Article I
of the Ohio Constitution.
 {¶ 28} "[8.] The trial court erred when it sentenced the defendant-appellant to more-than-the-minimum, consecutive and maximum prison terms in violation of the due process and ex post facto clauses of the Ohio and United States Constitutions.
 {¶ 29} "[9.] The trial court erred when it sentenced the defendant-appellant to more-than-the-minimum, consecutive and maximum prison terms in violation of defendant-appellant's right to due process.
 {¶ 30} "[10.] The trial court erred when it sentenced the defendant-appellant to more-then-the-minimum, consecutive and maximum prison terms based on the Ohio *Page 8 
Supreme Court's severance of the offending provisions underFoster, which was an act in violation of the principle of separation of powers.
 {¶ 31} "[11.] The trial court erred when it sentenced the defendant-appellant to more-than-the-minimum, consecutive and maximum prison terms contrary to the rule of lenity.
 {¶ 32} "[12.] The trial court erred when it sentenced the defendant-appellant to more-than-the-minimum, consecutive and maximum prison terms when the legislators drafting the provision demonstrated intent to limit judicial discretion to impose such sentences."
 {¶ 33} In the first assignment of error, Kidd argues that the disclosure of the identity of the confidential informant was necessary to establish that police had falsified information in the search warrant affidavit and to prepare for her defense at trial.
 {¶ 34} "The identity of an informant must be revealed to a criminal defendant when the testimony of the informant is vital to establishing an element of the crime or would be helpful or beneficial to the accused in preparing or making a defense to criminal charges." State v.Williams (1983), 4 Ohio St.3d 74, at syllabus. "In general, courts have compelled disclosure in cases involving `an informer who helped to set up the commission of the crime and who was present at its occurrence' whenever the informer's testimony may be helpful to the defense."State v. Bays (87 Ohio St.3d 15, 25 (citation omitted). However, "`where the informant merely provided information concerning the offense,' [the courts] `have quite consistently held that disclosure is not required.'" Id. (citation omitted); State v. Payne, 11th Dist. No. 2004-L-118, 2005-Ohio- *Page 9 
7043, at ¶ 41 ("[disclosure is not required * * * where the informant's role is that of a mere tipster").
 {¶ 35} The defendant bears the burden of demonstrating the need for disclosure. State v. Parsons (1989), 64 Ohio App.3d 63, 69 (citations omitted). "Something more than speculation about the possible usefulness of an informant's testimony is required. The mere possibility that the informer might somehow be of some assistance in preparing the case is not sufficient to satisfy the test that the testimony of the informant would be helpful or beneficial to the accused in preparing or making a defense to criminal charges." Id.; accord Payne, 2005-Ohio-7043, at ¶ 41; State v. Jordan, 1st Dist. No. C-060336, 2007-Ohio-3449, at ¶ 18.
 {¶ 36} The trial court's decision regarding a motion to disclose the identity of a confidential informant is reviewed under an abuse of discretion standard. Payne, 2005-Ohio-7043, at ¶ 38, citing State v.Elersic, 11th Dist. Nos 2000-L-062 and 2000-L-164, 2001-Ohio-8787, 2001 Ohio App. LEXIS 5210, at *19.
 {¶ 37} The informant's role in the present case was that of merely providing information to police, which led to further investigation and corroboration. The informant never testified at trial and Kidd's convictions were not based on information provided by the informant. Moreover, Kidd failed to demonstrate that disclosure of the informant's identity was necessary for the preparation of her defense. Kidd argues the informant's identity was necessary at the suppression hearing because the police had falsified information obtained from the informant. As will be demonstrated more fully below, the alleged falsification of information in the search warrant affidavit is based on inconsistencies between the affidavit and the account of the informant's information *Page 10 
contained in a police report. Disclosure of the informant's identity is not necessary in evaluating the veracity of an affidavit based on a written police report. Beyond this, it is well-established that "the desire to test the credibility and reliability of an informer who has been vouched for by the police is not a consideration that warrants disclosure." Payne, 2005-Ohio-7043 at ¶ 43, citing State v. Taylor
(1992), 82 Ohio App.3d 434, 446.
 {¶ 38} Kidd argues disclosure of the informant's identity was necessary to prepare her trial defense because the prosecution presented no witnesses "who were actually inside Ms. Kidd's apartment when drugs allegedly were being manufactured or sold. * * * Direct testimonial evidence of what actually occurred in the apartment, as gleamed [sic] from the confidential informant, could have been helpful to Ms. Kidd in her defense." As noted above, however, the "mere possibility" of an informant's usefulness is not sufficient to compel disclosure.Parsons, 64 Ohio App.3d at 69; Payne, 2005-Ohio-7043, at ¶ 41;Jordan, 2007-Ohio-3449, at ¶ 18.
 {¶ 39} The first assignment of error is without merit.
 {¶ 40} In the second assignment of error, Kidd argues the trial court erred in upholding the search warrant for Kidd's apartment where Chief Kish's affidavit misrepresented that the informant had actually seen drug manufacturing and sales occur at Kidd's apartment.
 {¶ 41} "In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a de novo determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is *Page 11 
simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant." State v.George (1989), 45 Ohio St.3d 325, at paragraph two of the syllabus.
 {¶ 42} "To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either `intentionally, or with reckless disregard for the truth.'" State v.Waddy (1992), 63 Ohio St.3d 424, 441, citing Franks v. Delaware (1978),438 U.S. 154, 155-156. "`Reckless disregard' means that the affiant had serious doubts of an allegation's truth. * * * Omissions count as false statements if `designed to mislead, or * * * made in reckless disregard of whether they would mislead, the magistrate.'" Id. (citations omitted). "Allegations of negligence or innocent mistakes are insufficient" to invalidate an otherwise valid warrant affidavit.Franks, 438 U.S. at 171.
 {¶ 43} Moreover, "[e]ven if the affidavit contains false statements made intentionally or recklessly, a warrant based on the affidavit is still valid unless, `with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause * * *.'" Waddy, 63 Ohio St.3d at 441, citingFranks, 438 U.S. at 156; State v. Gross, 97 Ohio St.3d 121,2002-Ohio-5524, at ¶ 17 ("after excising tainted information from a supporting affidavit, `if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid'"), citing United States v. Karo (1984),468 U.S. 705, 719. *Page 12 
 {¶ 44} In the present case, the confidential informant was interviewed by Fairport Harbor Police Officer Kulnane. Kulnane's report of the interview provides, in relevant part, as follows: "I met with the CI [confidential informant] who appeared to be shook up. * * * They eventually admitted that they did some crack at the lo cation earlier when someone, `Shotgunned' the smoke into their mouth. I should note that this means someone blew the smoke into their mouth usually through a tube or pipe. * * * CI told she knew there were drugs at the location. I asked them if they saw any drugs. They said no, but they just knew there were drugs there. They said while they were there, someone bought some crack. I asked them if they actually saw the deal or the drugs. They said they did not, D [Sweeney] gives Carole [Kidd] the drugs and she walks outside to make the deal. They said the deals happen down the street and not in the same place."
 {¶ 45} Chief Kish's warrant affidavit states that the informant "saw the drug manufacturing and drug use at the apartment."
 {¶ 46} Kidd correctly points out that Kish's affidavit misrepresents the informant's statements according to Kulnane's report. However, the misrepresentation does not invalidate the warrant.
 {¶ 47} Initially, Kidd exaggerates the extent of the misrepresentation. Although Kulnane's report suggests the informant never saw any drugs at Kidd's apartment, it also unequivocally states the informant was smoking crack at the apartment. Kish's statement that the informant "saw * * * drug use" is not false.
 {¶ 48} That part of Kish's affidavit claiming that the informant "saw * * * drug manufacturing" is false, but there is no evidence that Kish made this statement with *Page 13 
"reckless disregard" for the truth or with an intent to mislead the trial judge. The testimony at the suppression hearing demonstrates that Kish innocently or negligently misread Kulnane's report. Kish explained at the hearing that he interpreted the report to mean that the informant had not seen a "cachet or supply of crack cocaine."
 {¶ 49} For the sake of argument, even if Kish did intentionally misrepresent the informant's statement that she had observed drug manufacturing, the search warrant would remain valid. The trash pull from Kidd's apartment established sufficient probable cause of both drug use and trafficking. Contrary to Kidd's position on appeal, the evidence from her trash is not consistent with merely personal drug use. The existence of numerous bags with the corners removed is evidence that crack cocaine was being packaged for sale and corroborates the informant's statement that Kidd was selling crack.
 {¶ 50} The second assignment of error is without merit.
 {¶ 51} In the third assignment of error, Kidd argues the trial court erred by giving an instruction on complicity.
 {¶ 52} "For purposes of appellate review, `[t]he decision to issue a particular jury instruction rests within the sound discretion of the trial court.'" State v. Nichols, 11th Dist. No. 2005-L-017,2006-Ohio-2934, at ¶ 28 (citation omitted).
 {¶ 53} "When the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor, a jury instruction by the trial court on that subject is proper." State v.Perryman (1976), 49 Ohio St.2d 14, at paragraph five of the syllabus. "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, *Page 14 
assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." State v. Johnson,93 Ohio St.3d 240, 2001-Ohio-1336, at syllabus.
 {¶ 54} Kidd maintains the instruction on complicity was improper "because the State failed to present evidence that she knowingly helped, assisted, encouraged, advised, strengthened or associated herself in the commission of the crime." We disagree. The evidence demonstrated that Kidd rented, controlled, and had sole responsibility for the apartment wherein the trafficking and manufacturing of crack cocaine took place. If, for the sake of argument, Kidd's role in these activities was nothing more than allowing them to occur in the apartment, she could be found guilty of complicity. See the following trafficking/manufacturing cases, involving cohabitation situations: State v. Scott, 5th Dist. No. 06 CA 1, 2007-Ohio-303, at ¶¶ 28-42; State v. Molina, 8th Dist. No. 83731, 2004-Ohio-4347, at ¶¶ 22-27; State v. Morse, 5th Dist. No. 2003CA00191, 2004-Ohio-615, at ¶¶ 21-28; State v. Wilcoxen, 2nd Dist. No. 2002-CA-37, 2003-Ohio-6061, at ¶¶ 10-13; State v. Pepper, 2nd Dist. No. 19225, 2003-Ohio-3053, at ¶¶ 9-25. Accordingly, the complicity instruction was proper.
 {¶ 55} The third assignment of error is without merit.
 {¶ 56} Kidd's fourth and fifth assignments of error challenge the sufficiency and manifest weight of the evidence respectively.
 {¶ 57} The Ohio Rules of Criminal Procedure provide that a defendant may move the trial court for a judgment of acquittal "if the evidence is insufficient to sustain a conviction." Crim.R. 29(A). "`Sufficiency' is a term of art meaning that legal standard *Page 15 
which is applied to determine whether the case may go to the jury," i.e. "whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, quoting, Black's Law Dictionary (6 Ed.1990), 1433. Essentially, "sufficiency is a test of adequacy," that challenges whether the state's evidence has created an issue for the jury to decide regarding each element of the offense. Id.
 {¶ 58} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979),443 U.S. 307, 319. In reviewing the sufficiency of the evidence to support a criminal conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id., at paragraph two of the syllabus.
 {¶ 59} Weight of the evidence, in contrast to its sufficiency, involves "the inclination of the greater amount of credible evidence."Thompkins, 78 Ohio St.3d at 387 (emphasis sic) (citation omitted). Whereas the "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support the verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." State v. Wilson, 113 Ohio St.3d 382,2007-Ohio-2202, at ¶ 25 (citation omitted). "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" Id. *Page 16 
 {¶ 60} Generally, the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to determine. State v. Thomas (1982), 70 Ohio St.2d 79, at syllabus. When reviewing a manifest weight challenge, however, the appellate court sits as the "thirteenth juror." Thompkins, 78 Ohio St.3d at 387 (citation omitted). The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id., quoting Martin, 20 Ohio App.3d at 175.
 {¶ 61} At trial, Kidd testified in her own defense. She admitted that she was a heavy user of cocaine and crack cocaine and had been for a long time. She admitted that she would buy drugs for her own personal use and for her friends, which they also did for her. She denied that she was involved, in any way, with the manufacture of or trafficking in cocaine.
 {¶ 62} Kidd testified that she was involved with a man named Jeffery Spikes. Kidd testified that she was romantically involved with Spikes and had loaned him money. Spikes would provide Kidd with cocaine, but she did not know where Spikes obtained it. Kidd testified that Spikes had a key and complete access to her apartment. She testified that the safe in her bedroom belonged to Spikes and believed he kept money in it. She claimed that she did not have access to the contents of the safe and *Page 17 
had never opened it. She denied knowing that the safe contained drugs, but had overheard from police that the safe contained drugs on the night of the search.
 {¶ 63} Kidd admitted that she had obtained the stolen .38 from Shermer at Spikes' request, but did not know that he was storing it in the safe.
 {¶ 64} Kidd testified that Spikes had given her the key to the safe only a few hours before the police searched the apartment. She testified Spikes had given her the key because she was moving and she had put the key on the Durango key ring because they were going to use the Durango to move the safe.
 {¶ 65} Kidd denied knowing about the measuring cups and beakers in the kitchen, claiming she did not cook very much and was too short to reach the cabinets. Kidd denied knowing the scale was under her dresser. She admitted to knowing about the cocaine handbook, but claimed it was just something she looked at out of curiosity. Kidd testified that the men's clothing found in her bedroom belonged to her brother.
 {¶ 66} Kidd denied that Sweeney stayed at her apartment or manufactured crack cocaine there. Kidd testified that Sweeney, who is in his thirties, is her nineteen-year-old daughter's boyfriend.
 {¶ 67} In order to find that Kidd had committed the crime of Trafficking in Cocaine, the State was required to prove, beyond a reasonable doubt, that Kidd, "knowingly * * * [p]repare[d] for shipment, ship[ped], transported], delivered], prepare[d] for distribution, or distribute[d] a controlled substance," i.e. crack cocaine in excess of 100 grams as to first degree Trafficking and cocaine (that is not crack cocaine) in excess of 100 grams but less than 500 grams as to second degree Trafficking. R.C. 2925.03(A)(2), 2925.03(C)(4)(e), and2925.03(C)(4)(g). *Page 18 
 {¶ 68} The State introduced the following evidence demonstrating that Kidd was guilty of Trafficking. Shermer testified that he purchased cocaine from Kidd and Sweeney. This is direct evidence that Kidd distributed cocaine. Shermer referred to Kidd's apartment as "his [Sweeney's] house." From Kidd's apartment, the police recovered a digital scale; 294.34 grams of powder cocaine and 118.33 grams of crack cocaine packaged in various sizes; a handbook explaining the cocaine trade; and plastic baggies, some of which had the corners torn off. Sweeney's fingerprints were found on the scale and the handbook. The key ring on which the key to the safe containing the drugs was found also held the keys to the Durango Sweeney was operating. Sergeant Kemp testified, based on his experience in narcotics enforcement, that manufacturers/dealers often use the residences of drug users to conduct their trade in exchange for drugs. This is indirect, or circumstantial evidence, from which a jury could reasonably infer that Kidd was engaged in the distribution of cocaine and crack cocaine in excess of 100 grams and/or that she aided and abetted Sweeney in such distribution.
 {¶ 69} In order to find that Kidd had committed the crime of Possession of Cocaine, the State was required to prove, beyond a reasonable doubt, that Kidd, "knowingly obtain[ed], possessed], or use[d] a controlled substance," i.e. crack cocaine in excess of 100 grams as to first degree Possession and cocaine (that is not crack cocaine) in excess of 100 grams but less than 500 grams as to second degree Possession. R.C. 2925.11(A), 2925.11(C)(4)(f) and2925.11(C)(4)(d).
 {¶ 70} The evidence discussed relative to Trafficking also supports Kidd's convictions under the Possession counts. The cocaine was found in a safe in Kidd's *Page 19 
bedroom. The key to the safe was found in Kidd's apartment. According to police, Kidd admitted that she knew drugs were in the safe. This evidence is sufficient to prove that Kidd had possession of the drugs or aided and abetted another in their possession of the drugs.
 {¶ 71} In order to find that Kidd had committed the crime of Illegal Manufacture of Drugs, the State was required to prove, beyond a reasonable doubt, that Kidd, "knowingly manufacture[d] or otherwise engage[d] in any part of the production of a controlled substance," i.e. cocaine. See R.C. 2925.04; R.C. 3719.41 Schedule II(A)(4).
 {¶ 72} The cocaine handbook, the beakers and measuring cups, and the large amount of crack cocaine packaged for distribution found at Kidd's apartment, are all indicative of the manufacture of crack cocaine. Sergeant Kemp provided testimony regarding the manufacturing process itself. This evidence is sufficient to prove that Kidd had engaged in the manufacture of the drugs or aided and abetted another in the manufacture of drugs.
 {¶ 73} In order to find that Kidd had committed the crime of Possession of Criminal Tools, the State was required to prove, beyond a reasonable doubt, that Kidd, "possessed] or ha[d] under [her] control * * *, with purpose to use it criminally," a digital scale, cocaine handbook, safe and/or beakers. R.C. 2923.24(A).
 {¶ 74} It has been demonstrated above, how the scale, handbook, safe, and beakers were used for the production and distribution of crack cocaine. Thus, there is sufficient evidence to convict Kidd of Possession of Criminal Tools.
 {¶ 75} Kidd argues the State has merely proved the presence of incriminating items at her apartment, but no direct evidence that Kidd knowingly participated in any of *Page 20 
the crimes charged. The response to this argument is that it may reasonably be inferred, from the presence of these items at the apartment, that Kidd was engaged in the manufacture and sale of crack cocaine. The lack of direct evidence of involvement is no bar to Kidd's convictions. State v. Henderson (1988) 39 Ohio St.3d 24, 28
("[circumstantial evidence is sufficient to establish an element of any crime"); Jenks, 61 Ohio St.3d 259, paragraph one of the syllabus ("circumstantial and direct evidence inherently possess the same probative value").
 {¶ 76} Kidd also argues the inference that she was engaged in the manufacture and distribution of crack cocaine is against the manifest weight of the evidence, particularly in light of her own trial testimony. The response to this argument is that the jury, as the trier of fact, was free to disregard Kidd's explanation regarding the presence of the contraband and her ignorance thereof. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, at paragraph one of the syllabus; State v. Awan (1986), 22 Ohio St.3d 120,123 ("[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact").
 {¶ 77} There were many reasons for the jury to doubt Kidd's testimony. Apart from Kidd's testimony, there was no evidence to substantiate Spikes' existence or presence at her apartment, despite the efforts of police to do so. Kidd's claim that Spikes gave her the key to the safe so that it could be moved does not make sense. Kidd offered no explanation as to how Sweeney's fingerprints came to be on the digital scale. *Page 21 
 {¶ 78} Kidd's fourth and fifth assignments of error are without merit.
 {¶ 79} In the sixth assignment of error, Kidd argues the trial court erred by imposing the $10,000 mandatory fine, "without making any inquiries regarding Ms. Kidd's ability to pay and without stating a basis for [the court's] ruling."
 {¶ 80} The trial court imposed the $10,000 fine pursuant to R.C.2929.18(B)(1), which provides: "For a first * * * degree felony violation of any provision of Chapter 2925 * * * of the Revised Code, the sentencing court shall impose upon the offender a mandatory fine * * *. If an offender alleges in an affidavit filed with the court prior to sentencing that the offender is indigent and unable to pay the mandatory fine and if the court determines the offender is an indigent person and is unable to pay the mandatory fine described in this division, the court shall not impose the mandatory fine upon the offender."
 {¶ 81} The Ohio Supreme Court had held, in respect to such mandatory fines, "there is no requirement * * * that a trial court must make an affirmative finding that an offender is able to pay a mandatory fine."State v. Gipson, 80 Ohio St.3d 626, 635, 1998-Ohio-659 (emphasis sic);State v. Miller, 8th Dist. No. 86505, 2006-Ohio-4752, at ¶ 19 ("there is no affirmative duty on the trial court to make a finding that a defendant is able to pay").
 {¶ 82} A trial court's decision with respect to the imposition of a mandatory fine where the offender has an affidavit alleging indigency is reviewed under an abuse of discretion standard. Gipson,80 Ohio St.3d at 635.
 {¶ 83} In the present case, there was no abuse of discretion. The pre-sentence report available to the trial court indicated that Kidd is in good mental and physical *Page 22 
health, possesses a high school diploma, has a steady work history, owns a Harley Davidson motorcycle valued at $15,000, and has no minor children or dependents. Therefore, there was evidence before the court demonstrating Kidd's present and/or future ability to pay the fine imposed.
 {¶ 84} The sixth assignment of error is without merit.
 {¶ 85} In the seventh assignment of error, Kidd argues the trial court erred in imposing an additional two-year prison term for the Major Drug Offender specification. Kidd maintains that sentencing enhancements for Major Drug Offenders were eliminated by the Ohio Supreme Court's decision in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, as demonstrated by State v. Chandler, 109 Ohio St.3d 223, 2006-Ohio-2285.
 {¶ 86} This court has previously considered and rejected this argument. Sentencing enhancements for Major Drug Offenders pursuant to R.C. 2929.14(D)(3) remain valid. State v. Adams, 11th Dist. No. 2006-L-114, 2007-Ohio-2434, at ¶¶ 22-27.
 {¶ 87} The seventh assignment of error is without merit.
 {¶ 88} Under the eighth through twelfth assignments of error, Kidd challenges the imposition of maximum and consecutive prison terms on a variety of grounds relating to the Ohio Supreme Court's decision inFoster.
 {¶ 89} Kidd's arguments in this regard have been previously raised and rejected by numerous decisions of this court. State v. Aston, 11th Dist. No. 2006-L-216, 2007-Ohio-XXXX; State v. Marker, 11th Dist. No. 2006-P-0014, 2007-Ohio-3379; State v. McKinney, 11th Dist. No. 2006-L-169, 2007-Ohio-3389; State v. Green, 11th Dist. Nos. 2005-A-0069 and 2005-A-0070, 2006-Ohio-6695. *Page 23 
 {¶ 90} Kidd's arguments have also been consistently rejected by other Ohio appellate districts and federal courts. See State v. Gibson, 10th Dist. No. 06AP-509, 2006-Ohio-6899; State v. Moore, 3rd Dist. No. 1-06-51, 2006-Ohio-6860; United States v. Portillo-Quezada (C.A.10 2006), 469 F.3d 1345, 1354-1356, and the cases cited therein.
 {¶ 91} Assignments of error eight through twelve are without merit.
 {¶ 92} For the foregoing reasons, Kidd's multiple convictions for Trafficking in Cocaine, Possession of Cocaine, Illegal Manufacture of Drugs, and Possessing Criminal Tools, and her aggregate prison sentence of twelve years on these charges, are affirmed.
CYNTHIA WESTCOTT RICE, P.J., MARY JANE TRAPP, J., concur.
[1] Kidd does not appeal her conviction for Permitting Drug Abuse. *Page 1