OPINION
{¶ 1} Appellant, Shurmale L. Garner, appeals his judgment of conviction and sentence issued by the Lake County Court of Common Pleas, following a jury trial, on one count of Trafficking in Cocaine, with Major Drug Offender and Forfeiture Specifications and one count of Possession of Cocaine, also with Major Drug Offender and Forfeiture Specifications. We affirm the judgment of the lower court.
 {¶ 2} On February 28, 2006, at approximately 8:45 p.m., Officer Michael Gerardi of the Willoughby Hills Police Department was on routine patrol duty along Interstate 90, *Page 2 
when he observed a silver Infiniti traveling eastbound in the far left lane at a rate exceeding the posted speed limit of 60 miles per hour. As the vehicle approached Gerardi's location, he observed the Infiniti travel left of the center marker lane, change lanes to the middle lane, and subsequently change back to the left lane without signaling.
 {¶ 3} After observing these violations, Officer Gerardi, who operates the department's K-9 unit, pulled out of the crossover at the 181 mile marker, to effectuate a traffic stop. After stopping the vehicle, Officer Gerardi approached from the passenger side and knocked on the window. Garner, who was in the passenger seat, was talking on a cell phone. Officer Gerardi, leaned into the window, informed the driver and passenger of the reason for the stop, and requested a copy of the vehicle's license and registration. When he leaned in to speak to the driver and passenger, Gerardi noticed the "overwhelming" scent of air fresheners emanating from the vehicle and observed no less than four air fresheners in the vehicle. From his experience as a police officer routinely involved in traffic enforcement and drug interdiction, Gerardi knew this was an indicator of possible drug activity. When asked to describe the scent, Officer Gerardi characterized it as "overpowering" to the point of being "nauseating."
 {¶ 4} Officer Gerardi asked to see the driver's license and the vehicle's registration. The driver, Shanimba Nelson, produced his driver's license, and according to Officer Gerardi, "made visual contact * * * with the passenger, who then * * * obtained the registration from the glove box." Garner told Officer Gerardi that the vehicle was his. Subsequent confirmation of the registration certificate, which was issued in New York, indicated that the vehicle belonged to Garner. *Page 3 
 {¶ 5} A check into Nelson's license indicated that he was driving under suspension. According to Officer Gerardi, once a driver of a vehicle is found to be driving on a suspended license, Willoughby Hills police officers typically "check [with the passengers of a stopped vehicle] to see if any other driver's license is valid," so that the car can be driven away, if possible. Otherwise, the vehicle is towed from the roadway and impounded.
 {¶ 6} While the traffic stop was underway, Officer Matt Naegele arrived on the scene. Officer Gerardi stated that Officer Naegele and he serve as "backup [for] each other constantly on traffic stops." Based upon radio traffic associated with the stop, Sergeant Brian Jackson, the shift commander, arrived shortly thereafter.
 {¶ 7} Nelson was placed under arrest for operating the vehicle without a valid license, and put into Officer Naegele's police cruiser. Nelson was asked where he was coming from when he was stopped. Nelson indicated that he was returning to Rochester, New York, from Georgia. Garner, who was not under arrest at the time, was placed temporarily in the back of Sergeant Jackson's vehicle. He told police that they were returning to New York from Tennessee.
 {¶ 8} Based on his earlier observations and discrepancies in the men's answers, Officer Gerardi removed K-9 Arrow from his cruiser and walked him around Garner's vehicle. Arrow, who is trained to search for the presence of narcotics, alerted to the presence of a controlled substance within the vehicle.
 {¶ 9} K-9 Arrow's actions resulted in a search of Garner's vehicle. When searching the vehicle, Officer Gerardi noticed a gap in the passenger side seatback and that the seatback appeared to be loose. A similar gap was found on the driver's side. *Page 4 
 {¶ 10} Upon removal of the seatbacks, officers found two packages, wrapped in plastic, duct tape, and what were revealed later to be fabric softener sheets, behind the passenger seatback. Another similar package was found inside the back of the driver's seat. Each package contained what was later found to be cocaine, weighing 1008.4 grams, 1005.8 grams, and 1010.0 grams, respectively. Police also recovered five cellular phones from the vehicle.
 {¶ 11} Garner was placed under arrest, read his Miranda warnings, and transported to the Willoughby Hills police station.
 {¶ 12} Upon arrival at the station, Officer Gerardi started the booking process. Special Agent Clayton of the United States Drug Enforcement Agency (DEA), was also present during Garner's booking, due to the large amount of suspected controlled substance recovered from the car. Gerardi informed Garner that he was under arrest for Trafficking and Possession of Cocaine, and "three kilos [had been found] in the car." Officer Gerardi produced a Miranda card and read Garner his rights a second time. He asked if Garner understood his rights, and asked him to confirm his understanding by signing the card. After Garner signed the Miranda card, Officer Gerardi asked Garner if he wished to tell police "his side of the story." The booking and questioning process took 45 minutes to an hour in total.
 {¶ 13} Officer Gerardi characterized Garner's demeanor during questioning as "cooperative" and "very pleasant, considering the circumstances." Garner gave Gerardi a verbal statement taking responsibility for the cocaine. Garner was asked if he would provide a written statement, and Garner asked to have time to "think about it." *Page 5 
 {¶ 14} Garner and Nelson were placed in different cells, so that they would not have any contact with each other. Although Officer Gerardi's shift was to end at 11 p.m., he stayed at the station an "hour [to] an hour and a half" after his shift had ended.
 {¶ 15} Prior to leaving for the night, Officer Gerardi spoke with Sergeant Michael Planisek, the night shift commander, and informed him that Garner had provided a verbal statement taking responsibility for the cocaine found in his car. He also told Planisek that Garner "wished to provide a written statement, but did [not] want to give it at that particular time." Gerardi asked Planisek to check with Garner "sometime during the night at his leisure [to see if] he would provide it."
 {¶ 16} At approximately 1:50 a.m, on March 1, 2006, Sergeant Planisek made his routine rounds of the jail to check on the prisoners. Planisek found Garner awake in his cell. He characterized Garner's demeanor at the time as "normal." Sergeant Planisek asked Garner if he wished to provide a written statement at that time, and Garner agreed. He was taken from the cell into the booking room, where he was placed at a desk and provided a statement form. The top of the form contained language stating that Garner had been informed of his constitutional rights; that he had been advised of the charges that may be pending against him; and that he was providing the statement "voluntarily and of [his] own free will * * * without having been subjected to any coercion, unlawful influence, or unlawful inducement."
 {¶ 17} Garner then provided the following written statement:
 {¶ l8} "I, Shurmale Garner went to Marietta, Georgia to receive 3 kilo's [sic] of cocaine with intent to take back to Rochester, NY in exchange for cash. Shanimba Nelson didn't have any ideal [sic] what was going on he just thought it was a regular trip. *Page 6 
He was not around when things took place of I Shurmale Garner receiving 3 kilo's of cocaine." [sic]
 {¶ 19} On June 16, 2006, the Lake County Grand Jury returned a three count indictment against Garner. Count One charged him with Trafficking in Cocaine, in an amount exceeding 1,000 grams (3,024.20 grams), a first degree felony, in violation of R.C. 2925.03(A)(2), with a Major Drug Offender Specification, pursuant to R.C. 2929.01(X), and a Forfeiture Specification, pursuant to former R.C. 2925.42 relating to Garner's vehicle. Count Two charged Garner with Possession of Cocaine, in the amount of 3,024.20 grams, a felony of the first degree, in violation of R.C. 2925.11. Count Two contained the same Major Drug Offender and Forfeiture Specifications as Count One.
 {¶ 20} Count Three charged Garner with Possessing Criminal Tools, to wit, the 2002 Infiniti vehicle and the five cellular phones, a felony of the Fifth Degree, in violation of R.C. 2923.24.
 {¶ 21} Garner filed a motion to suppress his written and oral statements to police. Following a hearing held on November 27, 2006, the court denied Garner's motion.
 {¶ 22} The matter proceeded to trial before a jury on December 14, 2006. Following a two day trial, the jury returned a verdict of "Guilty" on Counts One and Two, and a verdict of "Not Guilty" on Count Three.
 {¶ 23} On December 28, 2006, Garner filed a Motion for New Trial. On January 24, 2007, the matter proceeded to sentencing, at which time Garner's Motion for New Trial was denied. Garner was sentenced to ten years imprisonment on Count One, and ten years on Count Two, to be served concurrently, and was ordered to serve an *Page 7 
additional term of three years on each Major Drug Offender specification concurrent with each other, but consecutive with, and prior to, the ten year prison terms for the underlying offenses, for a total term of thirteen years.
 {¶ 24} In addition, a mandatory fine of $10,000 was imposed for each of Counts One and Two, however, this fine was waived upon the filing of Garner's Affidavit of Indigency. Pursuant to former R.C. 2925.42, all of Garner's rights, title and interest in his 2002 Infiniti were forfeited to the Willoughby Hills Police Department.
 {¶ 25} Garner timely appealed the trial court's judgment of conviction, assigning the following as error for our review:
 {¶ 26} "[1.] The trial court erred and violated the defendant's Fourteenth and Fifth Amendment Constitutional rights when it denied his motion to suppress his statements to the Willoughby Hills Police Department.
 {¶ 27} "[2.] The trial court erred to the prejudice of the defendant when it overruled his Criminal Rule 29 motion for dismissal at the close of the state's case.
 {¶ 28} "[3.] The trial court erred and violated the defendant's Sixth Amendment right to an impartial jury after polling the jury and accepting a verdict contrary to law.
 {¶ 29} "[4.] The trial court erred and violated the defendant's Fourteenth Amendment and Sixth Amendment rights to an impartial jury when it sentenced him to a more than mandatory sentence due to the Major Drug Offender Specifications."
 {¶ 30} In his first assignment of error, Garner argues that the trial court erred in not granting his motion to suppress his oral and written statements to police, since, they were not voluntary, but rather the product of police coercion. We disagree. *Page 8 
 {¶ 31} An appellate court's review of the grant or denial of a motion to suppress presents a mixed question of law and fact. State v.Norman, 136 Ohio App.3d 46, 51, 1999-Ohio-961 (citation omitted). In a motion to suppress, the trial court acts as the trier of the facts and, as such, is in the best position to resolve factual issues and assess the credibility of witnesses. State v. Dohner, 11th Dist. No. 2003-P-0059, 2004-Ohio-7242, at ¶ 10 (citations omitted). When considering the trial court's ruling on a motion to suppress, an appellate court is bound to accept the trial court's findings of fact as long as these findings are supported by competent and credible evidence. Id. citing State v. Searls (1997), 118 Ohio App.3d 739, 741. Accordingly, this court will review a trial court's findings of fact only for clear error, and give due weight to the inferences the trial court drew from those facts. Id. "When an appeal is directed at a trial court's findings of fact, the reviewing court must determine only whether the findings were against the manifest weight of the evidence."State v. Bokesch, 11th Dist. No. 2001-P-0026, 2002-Ohio-2118, at ¶ 12. "Judgments supported by some competent, credible evidence going to all the essential elements * * * will not be reversed by a reviewing court as being against the manifest weight of the evidence." State v.Schulte (Oct. 25, 1996), 11th Dist. No. 94-L-186, 1996 Ohio App. LEXIS 4675, at *24 (citation omitted).
 {¶ 32} Once the trial court's factual determinations are accepted, the appellate court then conducts a de novo review of the trial court's application of the law to those facts. Dohner, 2004-Ohio-7242, at ¶ 10.
 {¶ 33} The United States Supreme Court, in Miranda v. Arizona (1966),384 U.S. 436, 444, held that the prosecution may not use statements stemming from custodial interrogation, unless it demonstrates that procedural safeguards were taken to secure *Page 9 
the defendant's privilege against self-incrimination. Among these safeguards are the Miranda warning, the right to end questioning at any time until an attorney is obtained, and an intelligent, knowing and voluntary waiver of this privilege. Id. The safeguards prescribed byMiranda become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest." Berkemer v.McCarty (1984), 468 U.S. 420, 440 (citation omitted).
 {¶ 34} Following a hearing on Garner's motion, the trial court made the following relevant findings in its judgment entry, in support of its conclusion that Garner knowingly and voluntarily waived his Miranda rights, and provided his oral and written statements voluntarily:
 {¶ 35} "At the time of his arrest Defendant was mirandized by Patrolman Gerardi of the Willoughby Hills Police Department. Defendant acknowledged that he understood these rights and was conveyed to the Willoughby Hills Police Station to be booked.
 {¶ 36} "At the station, Ptl. Gerardi and Special Agent John Clayton of the D.E.A. spoke to Defendant. In Ptl. Gerardi's presence, S.A. Clayton mirandized the defendant and Defendant again indicated that he understood. Defendant waived his right to an attorney and spoke with the law enforcement officers for approximately fifteen minutes. Defendant was calm and cooperative throughout the conversation. Further, Defendant never requested an attorney nor did he indicate any unwillingness to speak with the officers.
 {¶ 37} "Ptl. Gerardi informed Defendant that the amount of drugs in his possession constituted a felony of the first degree. In addition, Ptl. Gerardi told *Page 10 
defendant that any cooperation on his part would be noted and relayed to the prosecutor and the Court upon disposition of the case. The conversation did not cover any potential charges and possible prison terms. The officers did not promise leniency nor did they make any threats or promises in order to induce Defendant's statement. At the end of the conversation, Defendant indicated that he wanted to take responsibility, but desired to think it over before writing a statement. Defendant was placed in an unoccupied cell.
 {¶ 38} "Later, at approximately 2:00 a.m., Defendant was taken into the booking room to write his statement. No discussion was had and no further statements were made by law enforcement officers. The only other prisoner in the jail was the co-defendant, who had been kept separated from Defendant. Defendant wrote and signed his written statement, in which he confessed to going to Marietta, Georgia, and receiving three kilos of cocaine with the intent to take it back to Rochester, New York, in exchange for cash."
 {¶ 39} In determining the voluntary nature of a waiver of a criminal suspect's Miranda rights, a reviewing court will look at the "totality of the circumstances." State v. Gumm, 73 Ohio St.3d 413, 429,1995-Ohio-24. In deciding whether a defendant's statement is voluntary, the trial court should consider factors including, "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v.Worley, 11th Dist. No. 2001-T-0048, 2002-Ohio-4516, at ?161 (citation omitted). "A suspect's decision to waive his Fifth Amendment privilege against compulsory self-incrimination is made voluntarily absent *Page 11 
evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive policeconduct." State v. Dailey (1990), 53 Ohio St.3d 88, paragraph two of the syllabus (emphasis added).
 {¶ 40} At the suppression hearing, testimony was presented from Officer Gerardi, Officer Naegele, Sergeant Jackson, and Sergeant Planisek. Garner did not testify on his own behalf. Our review of this unrefuted testimony indicates that the trial court's findings were supported by competent, credible, evidence and thus, not against the manifest weight of the evidence. Officer Gerardi testified that he notified Garner of his rights concurrent with his arrest, and Garner acknowledged that he understood these rights.
 {¶ 41} During the booking process, the evidence reveals that Garner was twice read his rights from two separate Miranda cards. Although there is some confusion as to which officer actually read Garner his rights from the first card, it was signed by Garner, indicating that he understood his rights, and witnessed by Gerardi's signature. Later in the booking and interview process, Garner was read his rights by Sergeant Jackson from a second Miranda card, which contained Garner's signature and that of Sergeant Jackson.
 {¶ 42} There is no evidence that Garner ever requested an attorney at any point during his encounters with police. There was no evidence that Garner requested to make a phone call during questioning. His demeanor was variously described as "cooperative" and "pleasant," non-argumentative, "calm," and not "overly nervous," although Officer Gerardi testified that Garner was "a little depressed obviously * * * having just got arrested with three kilograms of cocaine." *Page 12 
 {¶ 43} Gerardi testified that since Garner was not from Ohio, he had a number of questions about what might happen to him. In response to his questioning, Gerardi testified that "[w]e opened up the Ohio Revised Code flipped through it, I believe I explained the penalty section to him for an F1 and basically that was it, we just told him that and he wanted to know what was going to happen to him. I said well, if he gave a statement, if he cooperated that I would ask for consideration from the prosecution." There is no evidence that any promises were made of a reduced charge or sentence, only that Garner's cooperation would be noted to the prosecutor. In the absence of other evidence of coercion, a promise of leniency is insufficient, as a matter of law, to render a suspect's statements involuntary under a "totality of the circumstances" analysis. State v. Edwards (1976), 49 Ohio St.2d 31, 41.
 {¶ 44} After Garner gave an oral statement, Officer Gerardi asked him if he would reduce it to writing. Garner responded that he wanted to "think about it," so Gerardi "did not push the issue." As stated earlier, Sergeant Planisek, at the behest of Officer Gerardi, went to see Garner at 1:50 a.m., and found him awake in his cell. At this time, Garner was asked if he wanted to make a written statement, and agreed to do so. Garner prepared the narrative admitting responsibility for the cocaine in his vehicle and signed the statement form.
 {¶ 45} Other evidence adduced at the suppression hearing indicated that Garner was 23 years of age at the time of the arrest; that the entire booking process, including questioning, lasted approximately 45 minutes to an hour; that Garner had previously been arrested, and thus, was familiar with police procedures. Although Garner now attempts to raise issues of both his competency and his mental state, these arguments *Page 13 
are based upon unsworn comments made by him during pretrial and a mischaracterization of Officer Gerardi's trial testimony. In reviewing a trial court's decision to deny a motion to suppress, an appellate court is confined to the evidence produced during the suppression hearing.State v. Weese, 9th Dist. No. 20769, 2002-Ohio-375 0, at ¶ 14 n. 2 (citation omitted) (emphasis added).
 {¶ 46} Even if these issues had been properly raised in Garner's suppression motion, we would find no merit to his arguments. The trial court ordered a psychological evaluation pursuant to Garner's "Motion for [a] Competency Evaluation" and held a hearing on this motion prior to the filing of his Motion to Suppress. Following this hearing, the trial court determined that Garner was competent to stand trial. The court's determination was based upon the psychological evaluation of Garner performed by Dr. Jeffrey Rindsberg, which concluded that Garner's responses related to his mental competency showed "obvious exaggerating" and "malingering."
 {¶ 47} Based upon the totality of the circumstances, we conclude that Garner's statements to police were knowing and voluntary, and the trial court did not err in denying his motion to suppress.
 {¶ 48} Garner's first assignment of error is without merit.
 {¶ 49} In his second assignment of error, Garner argues that the trial court erred in not granting his Crim.R. 29 motion. Specifically, he argues that the state failed to produce sufficient evidence to sustain his convictions for Trafficking in Cocaine and Possession of Cocaine.
 {¶ 50} Under the Ohio Rules of Criminal Procedure, a defendant may move the trial court for a judgment of acquittal "if the evidence is insufficient to sustain a *Page 14 
conviction." Crim.R. 29(A). "[Sufficiency of the evidence * * * challenges whether the state has presented evidence for each element of the charged offense. The test for sufficiency of evidence is whether, after viewing the probative evidence and the inferences drawn from it,in a light most favorable to the prosecution, any rational trier of fact could find all elements of the charged offense proven beyond a reasonable doubt." State v. Barno, 11th Dist. No. 2000-P-0100, 2001-Ohio-4319, 2001 Ohio App. LEXIS 4280, at *16, citing State v.Jones, 91 Ohio St.3d 335, 345, 2001-Ohio-57 (emphasis added).
 {¶ 51} Whether sufficient evidence has been presented is a question of law, thus, an appellate court is not permitted to weigh the evidence when making this inquiry. State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at *13 (citations omitted). Thus, an appellate court will examine the evidence and determine whether that evidence, "if believed, would convince the average mind of a defendant's guilt beyond a reasonable doubt." State v. Norwood, 11th Dist. No. 2005-L-047, 2006-Ohio-3415, at ¶ 15, citing State v.Jenks (1991), 61 Ohio St.3d 259, 273 (emphasis added).
 {¶ 52} In order to survive a sufficiency of the evidence challenge for Trafficking in Cocaine, the state must offer evidence that would convince a reasonable juror that Garner "knowingly * * * ship[ped] [or] transported] * * * a controlled substance, when the offender knows or has reasonable cause to believe that the controlled substance is intended for sale or resale by the offender or another person." R.C.2925.03(A)(2). In the instant case, in order to prove both the first degree felony Trafficking and the Major Drug Offender specification, the prosecution must also offer evidence that "the amount *Page 15 
of the drug involved equals or exceeds one thousand grams of cocaine that is not crack cocaine." R.C. 2925.03(C)(4)(g).
 {¶ 53} With regard to possession, the state must offer evidence that Garner "knowingly obtain[ed] [or] possessed] * * * a controlled substance." R.C. 2925.11(A). Similar to the Trafficking offense, the prosecution must offer evidence that "the amount of the drug involved equals or exceeds one thousand grams of cocaine, that is not crack cocaine," in order to prove the first degree Possession offense with the Major Drug Offender specification. R.C. 2925.11(C)(4)(f).
 {¶ 54} "Knowingly" for the purpose of determining criminal culpability under the Ohio Revised Code, is defined as follows: "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." State v. Higgins, 11th Dist. No. 2005-L-215, 2006-Ohio-5372, at ¶ 29, citing R.C. 2901.22(B).
 {¶ 55} "R.C 2925.01(K) defines possession as having control over a thing or substance, but possession may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." State v.Franklin, 5th Dist. No. 23007-CA-00022, 2007-Ohio-4649, at ¶ 19. However, possession may be proven by circumstantial evidence of "`constructive possession', in which the accused is found in very closeproximity to readily usable drugs." Id., citing State v. Barr (1993),86 Ohio App.3d 227, 235 (emphasis added). *Page 16 
 {¶ 56} Beyond Garner's own admission that he "went to Marietta Georgia to receive 3 kilo's [sic] of cocaine with intent to take back to Rochester, NY in exchange for cash," there was other evidence offered sufficient to prove that Garner was guilty of Trafficking and Possession of Cocaine beyond a reasonable doubt.
 {¶ 57} The record reveals that the 2002 Infiniti used in transporting the cocaine was registered to Garner. When Officer Gerardi first approached the vehicle, Garner and Nelson were the only occupants. Officer Gerardi noted an "overwhelming, nauseating" odor of air fresheners emanating from the vehicle, which he testified, based upon his training and experience, was sometimes used as a means of masking odors of large amounts of drugs being smuggled interstate.
 {¶ 58} During the stop, K-9 Arrow alerted to the scent of drugs coming from Garner's vehicle. A cursory view of the interior of the car by police indicated that each of the front seatbacks had been tampered with. When the seatbacks were removed, police found two duct-taped packages behind the passenger seat (Garner's), and one behind the driver's seat. An expert who analyzed the substance found in Garner's vehicle testified that it was cocaine, with a total weight of 3024.2 grams, or 6.6 pounds. Officer Gerardi also testified as to the presence of five cellular phones found in the vehicle, which he explained was significant, because smugglers are often given "clean" cellular phones that are not traceable "so that they can use [them] to call back and forth [to] let them know where their load is, if they run into any problems, things of that nature." *Page 17 
 {¶ 59} Viewing this evidence in the light most favorable to the prosecution, the state has unquestionably offered sufficient evidence to support Garner's convictions for both Trafficking and Possession of Cocaine in an amount exceeding 1,000 grams.
 {¶ 60} Garner's second assignment of error is without merit.
 {¶ 61} In his third assignment of error, Garner maintained that the trial court committed prejudicial error by accepting the guilty verdict of the jury where polling of the jury revealed that "not all of the jurors found him guilty beyond a reasonable doubt." We disagree.
 {¶ 62} "An appellate court reviews a court's acceptance of a jury's verdict under an abuse of discretion standard." State v. Boyd, 9th Dist. No. 22151, 2005-Ohio-73, at ¶ 10, citing State v. Brumback (1996),109 Ohio App.3d 65, 73. This court "will not disturb the trial court's ruling unless it has exhibited an `unreasonable, arbitrary, or unconscionable' attitude." Id., citing State v. Lowe, 69 Ohio St.3d 527,532, 1994-Ohio-345.
 {¶ 63} "R.C. 2945.77 and Crim.R. 31(D) provide for the polling of the jury after the verdict to ascertain whether there is a unanimous verdict." Brumback, 109 Ohio App.3d at 72. "R.C. 2945.77 requires the jury to deliberate further if a juror declares a verdict is not his own; Crim.R. 31(D) allows the court to either direct further deliberations or to discharge the jury, if `there is not unanimous concurrence' in the verdict." Id. "Both the statute and the rule preclude acceptance of the verdict only if the jury members are not in agreement on thedetermination of guilt." Id (emphasis added).
 {¶ 64} In the instant matter, defense counsel requested that the jury be polled. The following exchange took place with Juror #4 during the polling of the jury. With the *Page 18 
 {¶ 65} "THE BAILIFF: [Juror Number 4]?
 {¶ 66} "JUROR [Number 4]: No.
 {¶ 67} "THE BAILIFF: [Juror Number 5]?
 {¶ 68} "JUROR [Number 5]: Yes.
 {¶ 69} "THE COURT: I'm sorry, what was your response Number 4?
 {¶ 70} "JUROR [Number 4]: No.
 {¶ 71} "THE COURT: This is not your verdict?
 {¶ 72} "JUROR [Number 4]: Well, that's my verdict now, yes.
 {¶ 73} "THE COURT: Pardon me?
 {¶ 74} "JUROR [Number 4]: Yes.
 {¶ 75} "THE COURT: Well, now you've confused me.
 {¶ 76} "JUROR [Number 4]: Yes.
 {¶ 77} "THE COURT: The question is the verdict that has been reported and that allegedly was signed by you is or is not your verdict?
 {¶ 78} "JUROR [Number 4]: Yes.
 {¶ 79} "THE COURT: Now is there a reason why you said no?
 {¶ 80} "JUROR [Number 4]: No.
 {¶ 81} "THE COURT: Very well, proceed."
 {¶ 82} Garner cites to two Second District cases, State v.Trussell (May 16, 1979), 2nd Dist. No. 5927, 1979 Ohio App. LEXIS 10640, and State v. Pheanis, 2nd Dist. No. 20667, 2005-Ohio-1372, for the proposition that when a juror reveals "then *Page 19 
existing doubt," a trial court is "obligated * * *, in the exercise of its discretion, to either direct the jurors to deliberate further or to discharge them and declare a mistrial." Pheanis, 2005-Ohio-1372, at ¶ 77.
 {¶ 83} Although we agree, as a general proposition, with the holdings of Trussell and Pheanis, "[i]f there is doubt as to whether a juror has agreed to the verdict, the court may interrogate the juror to clarifyhis answer" without running afoul of R.C. 2945.77 and Crim.R. 31(D).Brumback, 109 Ohio App.3d at 72 (citations omitted) (emphasis added);Boyd, 2005-Ohio-73, at ¶¶ 12-13, see also State v. Brown (1953),110 Ohio App. 57, 61 ("A juror should show, by direct statement, that the verdict is his true vote on the issue, but it is not wrong for the trial court to interrogate the juror to make clear such juror's answer when, upon poll, there is a doubt as to the vote being given.").
 {¶ 84} The foregoing colloquy between the trial court and Juror Number 4 reveals no such "then-existing doubt" as to her verdict, like there was in Trussell and Pheanis. Although the record reveals some initial confusion as to what Juror Number 4's initial response meant, when the trial court sought clarification as to whether the verdict of guilty was hers, Juror Number 4 unequivocally responded, "[w]ell that's my verdict now, yes." Where a juror does "not indicate to the court that she does not presently agree with the verdicts of the jury or that she wishe[s] to withdraw her signature to the verdict forms * * * [a] trial court [does] not err in finding that there was a unanimous concurrence in the verdict and entering judgment." State v. Brooks (Oct. 13, 1983), 8th Dist. No. 46102, 1983 Ohio App. LEXIS 15142, at *3.
 {¶ 85} Garner's third assignment of error is without merit. *Page 20 
 {¶ 86} In his fourth assignment of error, Garner argues that the trial court erred in imposing an additional three year sentence under the Major Drug Offender specification, since the Ohio Supreme Court's decision in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, rendered imposition of a sentence for a Major Drug Offender classification under R.C. 2929.14(D)(3) unconstitutional as a matter of law.
 {¶ 87} This court has previously considered and rejected this argument. See State v. Adams, 11th Dist. No. 2006-L-114, 2007-Ohio-2434, at ¶¶ 24-27; State v. Kidd, 11th Dist. No. 2006-L-193, 2007-Ohio-4113, at ¶ 86 ("Sentencing enhancements for Major Drug Offenders pursuant to R.C.2929.14(D)(3) remain valid.").
 {¶ 88} Garner's fourth assignment of error is without merit.
 {¶ 89} For the foregoing reasons, we affirm the judgment of the Lake County Court of Common Pleas.
CYNTHIA WESTCOTT RICE, P.J., TIMOTHY P. CANNON, J.,
 concur. *Page 1